Ray E. DAVIS, Plaintiff,

v.

Constantin COSTA–GAVRAS, Universal Studios, Inc., and MCA, Inc., Defendants.

No. 83 Civ. 2539 (MP).

United States District Court, S.D. New York.

March 2, 1987.

Amended Memorandum May 5, 1987.

See also 650 F.Supp. 153.

Robert Kasanof, New York City, Grais & Richards by Barry A. Bohrer, Lee Richards, Linda Cantoni, New York City, for plaintiff.

Williams & Connolly by David E. Kendall, Stephen A. Steinbach, Nicole K. Seligman, Washington, D.C., Irving Younger, Minneapolis, Minn., (Patterson, Belknap, Webb & Tyler by Eugene L. Girden, of counsel) New York City, for defendants.

## OPINION

MILTON POLLACK, Senior District Judge.

### Preliminary

This is a libel case brought by a public figure which presently is before the Court on a motion by the defendants for summary judgment in their favor pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Following the submission of affidavits and deposition testimony on the motion, the Court determined that an oral evidentiary hearing was needed under Rule 43(e) of the Federal Rules of Civil Procedure to aid in determining with a fair degree of specificity what plaintiff is able to present at a trial that is provable, clear and convincing affirmative evidence of actual malice on the part of the defendants in publishing the alleged defamation.

■ Absent such evidence, the action cannot be maintained as a matter of law, see New York Times v. Sullivan, 376 U.S. 254, 279–280, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), and the existence of such evidence is appropriately determined on a motion for summary judgment. See Anderson v. Liberty Lobby, Inc., — U.S. —, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Yiamouyiannis v. Consumers Union, 619 F.2d 932, 940 (2d Cir.), cert. denied, 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980) (libel claim dismissed under Rule 56 where plaintiff failed to come forward with clear and convincing evidence of actual malice.)

The only remaining defamation charged in the complaint is that in their film, "Missing," defendants allegedly portrayed with actual malice that plaintiff, the Commander of the United States Military Group and Chief of the United States Mission to Chile at the time of the 1973 coup in Chile, ordered or approved a Chilean order to kill Charles Horman, an American residing in Chile.

It is now clear that this is a case devoid of any evidence of actual malice. There is no evidence thereof to be considered; no prima facie case at all is supplied on any standard of proof on the requirement of actual malice, be it a preponderance or clear and convincing.

Summary judgment should be granted when the evidence propounded is "of insufficient caliber or quality to allow a rational finder of fact to find actual malice by clear and convincing evidence;" there then is "no genuine issue." Liberty Lobby, 106 S.Ct. at 2513. A jury could not properly return a verdict herein in plaintiff's favor; the evidence is so one-sided that defendants must prevail as a matter of law.

■ Actual malice is established in a public figure defamation litigation only where defendant publishes a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times v. Sullivan, 376 U.S. at 279–80, 84 S.Ct. at 725–26. Reckless disregard in such a case means that a defendant published after he "in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

The paper record on this motion consists of an enormous mass of words. The Rule 43(e) hearing was ordered to permit plain-

tiff to present or designate any clear and convincing evidence of actual malice detached from the obscure and semantic allusions thereto in the moving papers, and so as to allow the Court to assess the record expeditiously and accurately.

At the Rule 43(e) hearing, the plaintiff conceded that he had no evidence to offer on the requisite standard beyond what was contained in the papers and depositions submitted in opposition to the motion—plaintiff called no witnesses. A prolix and cloudy paper response will not suffice to defeat a motion for summary judgment to dismiss a public figure libel claim. The Rules obligated the nonmoving party to designate "specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P. 56(e); see Celotex Corp. v. Catrett, — U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). No such facts have been furnished.

### Designated Evidence Offered by Plaintiff

Plaintiff alleges that there are four general categories of purported evidence in the paper defense to the motion from which to find actual malice on behalf of defendants: (1) that defendants' "entire purpose in making 'Missing' was to show plaintiff as responsible for Charles Horman's death"; (2) that defendants' reliance on Thomas Hauser's book *The Execution of Charles Horman ("Execution")* was unreasonable; (3) that defendants never consulted with plaintiff on the facts presented in the film; and (4) that "Missing" contains scenes portraying certain episodes which defendants knew were embroidered.

An analysis of the record shows that to accept the plaintiff's opposition to summary judgment would require a distortion of the proofs, deviation from applicable law, and wrenching of the film out of its plain context.

### A. *The Thesis of the Film*

Plaintiff has produced no evidence in his papers to substantiate his assertion that the purpose of "Missing" was to make a non-fictional film establishing that Ray Davis, the plaintiff, was responsible for Charles Horman's death. To the contrary, the papers unalterably establish that the film is not a non-fictional documentary or aimed at Ray Davis as an individual, and that it cannot be understood as other than a dramatization of a true story. The film includes fictional characters and a composite portrayal of the American military presence in Chile at the time of the uprising and Allende coup.

The theme of the film is the search for a missing man by his father and his wife. The man who disappeared is finally found to have been executed by the Chilean military. The film is *based upon* a true story. It is only in that setting that the composite conduct of the American governmental representatives in Chile at the time and the degree of their assistance in that search comes under scrutiny and criticism. There is no person named Ray Davis referred to in the film at any time. Ray Tower, with whom the plaintiff associates himself, is a symbolic fictional composite of the entire American political and military entourage in Chile.

The film derives from and is solidly documented and supported by the stories relied on by the filmmakers, taken from the acts and statements of the concerned father and the anguished wife set forth in detail in Thomas Hauser's book, *Execution*. Those sources are shown to have been heavily investigated and confirmed by the filmmakers, who entertained no serious doubts of their truth or knowledge to the contrary of what they portrayed.

We pause to point out that the Supreme Court has emphasized that "actual malice" in the context of the First Amendment does not even include "spite, hostility or intention to harm." *Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 10, 90 S.Ct. 1537, 1539–40, 26 L.Ed.2d 6 (1970); *see also Garrison v. Louisiana*, 379 U.S. 64, 78–79, 85 S.Ct. 209, 217–18, 13 L.Ed.2d 125 (1964) (reckless disregard not established by a finding of "ill-will, enmity, or a wanton desire to injure.")

Rather, the actual malice inquiry focuses on the publisher's state of mind regarding the truth of his statements. *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 276, 91 S.Ct. 621, 627, 28 L.Ed.2d 35 (1971).

■ To prevail on a motion for summary judgment plaintiff must come forward with clear and convincing provable evidence that defendants *knowingly* and *falsely* published the alleged defamation in the film, or in fact entertained *serious doubts* as to the truth of the film's alleged defamatory statement, yet recklessly disregarded those doubts. *See Liberty Lobby,* 106 S.Ct. at 2513; *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325; *New York Times v. Sullivan,* 376 U.S. at 279–280, 84 S.Ct. at 725–26.

**B.** *Defendants' Reliance on Hauser's Book*

■ "Missing" is a dramatic portrayal of events and interpretations detailed in Thomas Hauser's book, *Execution.* The substance of the movie's scenes is extracted directly from *Execution.* To meet those facts, plaintiff purports to suggest that defendants' reliance on Hauser's book was unreasonable and that Hauser's credentials would have disclosed him to be "suspect" had a good faith search by defendants been made.

■ As a matter of law, to prevail on a defamation claim against a public official a plaintiff must do more than propound potential avenues of investigation that a defendant might have pursued. "[M]ere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." *Gertz v. Robert Welch,* 418 U.S. 323, 332, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974). "Rather, a public figure defamation plaintiff must show either that the publisher actually entertained serious doubts about the veracity of the publication, or that there are *'obvious* reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Herbert v. Lando,* 781 F.2d 298, 308 (2d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986) (emphasis in original)

quoting in part *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325.

There is nothing in the record tending to show that the filmmakers questioned Hauser's credentials or his book in any respect at the time "Missing" was made. The record is to the contrary. The filmmakers met with Hauser, went over his investigation and sources, supplied him with drafts of the script under preparation and were satisfied that there was no reason to doubt his work. No evidence whatever challenges those facts. Certainly the filmmakers obtained no knowledge contradicting the veracity or accuracy of Hauser's book and the stories of the Hormans as told to them and reflected in the book. There is no suggestion to the contrary from any provable sources. Indeed, nothing in plaintiff's papers demonstrates that either Hauser's credentials or his book, which was nominated for a Pulitzer Prize, are in fact "suspect" in any way.

The filmmakers knew that Hauser was a lawyer who had served as a judicial clerk in the Chambers of a Federal Judge and then worked for a prestigious Wall Street law firm. They knew that Hauser interviewed Captain Ray Davis, as well as other United States officials in Chile and numerous other persons when preparing *Execution.* The filmmakers also knew that no legal action whatsoever was taken against the book in the approximately four years since its publication. In an August 1980 meeting where Costa-Gavras, the film's director, and Stewart, the co-scriptwriter, met with Hauser to verify the accuracy of his book, Hauser described his meticulous research methods and broad inquiries. There is no evidence to the contrary.

The filmmakers then met with Charles Horman's parents, his wife, and one Terry Simon, a close friend who was in Chile with Charles around the time of his disappearance. Each of these individuals made clear to Costa-Gavras and Stewart that Hauser's book accurately and reliably depicted events as they knew and believed them. There is no evidence that any of defendants' further research and review of doc-

uments regarding Horman and events in Chile during the coup caused them to doubt the veracity of Hauser's book.

Plaintiff argues that an effective search of Hauser's background would have disclosed "fraudulent letters" sent by Hauser to political figures and The New York Times. This allusion is to Hauser's political satires where he had written on public issues to officials in the voice of a nine-year old boy, "Martin Bear." The New York Times, in fact, solicited from Hauser and published on its "op-ed" page one of these satirical pieces, which can hardly be reason to "suspect" the veracity of his book.

In any event, plaintiff has neither presented nor designated specific facts suggesting or from which it could be reasonably inferred and found that defendants entertained serious doubts as to Hauser's account or that there were obvious reasons to doubt the veracity or accuracy of Hauser's book. Absent such evidence, reliance on *Execution* is not evidence of actual malice. *Herbert v. Lando,* 781 F.2d at 298 (plaintiff must show either that publisher "entertained serious doubts" or "obvious reasons" to doubt source). *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325 ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing.")

### C. *Failure to Consult Plaintiff Prior to Making Film*

Plaintiff argues that defendant's failure to consult plaintiff personally prior to presentation of the film is evidence of actual malice.

However, plaintiff cannot prove actual malice merely by asserting that a publisher failed to contact the subject of his work. *See Vandenburg v. Newsweek, Inc.,* 507 F.2d 1024, 1027–28 (5th Cir.1975) (failure to verify story with plaintiff prior to publication insufficient evidence of actual malice.); *Hurley v. Northwest Publications, Inc.,* 273 F.Supp. 967, 974 (D.Minn. 1967), *aff'd.* 398 F.2d 346 (8th Cir.1968) (same). The actual malice standard cannot

be satisfied by evidence of a failure to check with third parties prior to publication without proof that a publisher knew his publication was false, entertained serious doubts as to its truth, or had obvious reasons to doubt the veracity or accuracy of the source of published information. *See New York Times v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 725–26; *St. Amant v. Thompson,* 390 U.S. at 731, 88 S.Ct. at 1325. *Gertz,* 418 U.S. at 332, 94 S.Ct. at 3003; *Herbert v. Lando,* 781 F.2d at 298.

While "verification of facts" of a story with its subjects and with others is a desirable and responsible practice and "an important reporting standard, a reporter, without a 'high degree of awareness of their probable falsity,' may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution...." *New York Times v. Connor,* 365 F.2d 567, 576 (5th Cir.1966). Plaintiff has not designated specific facts suggesting an awareness or even suspicion by defendants of probable falsity of their source material.

### D. *Scenes in "Missing" as Evidence Of Actual Malice*

Plaintiff enumerates nine scenes in "Missing" which the filmmakers allegedly created, or in which they distorted the context, or made baseless suggestions. None of these scenes provides or contributes to the requisite evidence of actual malice.

It should be made clear that "Missing" is not a documentary, but a dramatization of the Horman disappearance and search. The film does not purport to depict a chronology of the events precisely as they actually occurred; it opens with the prologue: "This film is *based on* a true story. The incidents and facts are documented. Some of the names have been changed to protect the innocent and also to protect the film." (emphasis supplied). No one challenged the accuracy and veracity of Hauser's book to the knowledge of defendants. Defendants concede that although the substance of the film's scenes is extracted almost directly from Thomas Hauser's book, not

everything in their film is literally faithful to the actual historical record as if in a documentary. That is not to say that which was not historical was set out in bad faith, portrayed with actual malice, or established or increased the defamatory impact.

The film is not a documentary. A documentary is a non-fictional story or series of historical events portrayed in their actual location; a film of real people and real events as they occur. A documentary maintains strict fidelity to fact.

"Missing," on the other hand, is an art form sometimes described as "Docu-Drama." The line separating a documentary from a docudrama is not always sharply defined, but is nonetheless discernible. Both forms are necessarily selective, given the time constraints of movies and the attention span of the viewing audience. The docudrama is a dramatization of an historical event or lives of real people, using actors or actresses. Docudramas utilize simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes. This treatment is singularly appropriate and unexceptionable if the context is not distorted when dealing with public and political figures.

Self-evidently a docudrama partakes of author's license—it is a creative interpretation of reality—and if alterations of fact in scenes portrayed are not made with serious doubts of truth of the essence of the telescoped composite, such scenes do not ground a charge of actual malice.

■ Each scene questioned by the plaintiff is a telescoped composite of events, personalities, and of the American representatives in Chile who are involved therein. Each uses permissible literary license to fit historical detail into a suitable dramatic context. Such dramatic embellishments as are made do not distort the fundamental story being told—the frantic search by his family for a missing man who has suddenly disappeared, their emotions, anxieties, impatience, frustration, and doubts of assistance from American officialdom. The scenes are thus a hybrid of fact and fiction which however do not materially distort the analysis. Always to be remembered is that they fairly represent the source materials for the film believed to be true by the filmmakers. Leeway is properly afforded to an author who thus attempts to recount a true event.

As a matter of law, the dramatic overlay supplied by the film does not serve to increase the impact of what plaintiff charges as defamatory since it fairly and reasonably portrays the unassailable beliefs of the Hormans, the record thereof in the Hauser book, and the corroborative results of the authors' inquiries. In docudrama, minor fictionalization cannot be considered evidence or support for the requirement of actual malice.

The nine scenes selected by plaintiff as support for the requirement of actual malice do no such thing. Each is related solely and unquestionably to the theme of this film. The movie's Ray Tower character is a fictional composite of the American presence operating in Chile at the time. He is a symbolic figure. The artistic input in the scenes questioned is found in permissible syntheses and composite treatment in the film. Although in actuality particular individuals were not physically present when certain dialogue occurred, in the movie scene the composite character portrayed was.

The content of the film reflects what happened according to the book, the persons who complained, and the sources relied on by defendants. While the actual persons involved in the events portrayed do not appear in on-scene interviews to describe their experiences, actions, and motivations, the real names of some individuals are employed. But the name Ray Davis is never mentioned. Real life personalities are accordingly represented by telescoped composites in many instances.[1]

■ The cases on point demonstrate that the First Amendment protects such dramatizations and does not demand literal truth in every episode depicted; publishing a dramatization is not of itself evidence of actual malice.

In *Street v. National Broadcasting Co.,* 645 F.2d 1227 (6th Cir.), *cert. granted,* 454 U.S. 815, 102 S.Ct. 91, 70 L.Ed.2d 83 *cert. dismissed,* 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981), the Court of Appeals affirmed a ruling on a directed verdict that the dramatization embodied in defendant's broadcast program on the Scottsboro rape trial was protected by the *New York Times v. Sullivan* standard, and not chargeable with actual malice. While the dramatiza-

**1.** The nine questioned scenes are summarized in the Appendix.

tion contained certain literal falsehoods, including undocumented statements and conversations, *Street*, 645 F.2d at 1231, the movie was based "in all material respects" on the Judge's findings in the Scottsboro case, and a book by a historian documenting the Scottsboro trial. *Id.* at 1237. *See also Reader's Digest Association v. Superior Court*, 37 Cal.3d 244, 264, 690 P.2d 610, 623, 208 Cal.Rptr. 137, 150 (1984) (summary judgment granted, and no triable issue of actual malice presented where published material "falls within an acceptable range of literary license."); *Leopold v. Levin*, 45 Ill.2d 434, 259 N.E.2d 250, 256 (1970) (insufficient evidence of actual malice to overcome summary judgment where fictionalized episodes could be "traced in a substantial way" to a recorded source).

Similarly, in *Meeropol v. Nizer*, 381 F.Supp. 29 (S.D.N.Y.1974), *aff'd*, 560 F.2d 1061 (2d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978), summary judgment was granted for a defendant sued for defamation of a public figure based on plaintiff's inability to designate specific evidence of actual malice. Defendant had written a book based on letters written by Ethel and Julius Rosenberg, convicted spies. The book contained "minor fictionalizations or approximations of conversations." *Meeropol*, 381 F.Supp. at 35. The court held that these do not supply the requisite specific evidence of actual malice:

> Such techniques do not rise to the constitutional level of clear and convincing showing of reckless disregard.... [D]eviations from or embellishments upon the information obtained from the primary sources relied upon were miniscule and can be attributed to the leeway afforded an author who attempts to recount and popularize an historic event." *Id.*

*Hotchner v. Castillo-Puche*, 551 F.2d 910 (2d Cir.), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977), was an appeal of a judgment entered after a jury verdict for plaintiff. Defendant published a book which purported to quote derogatory remarks by Ernest Hemingway about plaintiff. Defendant did not print the literal words used by Hemingway, and "was fictionalizing to some extent." *Hotchner*, 551 F.2d at 914. The Court of Appeals held that such fictionalization or dramatization does not satisfy the requirement of clear and convincing evidence from which a jury might reasonably find that defendant published the alleged libel with actual malice. Actual malice could not be inferred because "the change did not increase the defamatory impact or alter the substantive content" of Hemingway's original statement which defendants relied upon. *Id.*

### Conclusion

The issue on the motion is not the truth of whether Davis (qua Ray Tower) ordered or approved a Chilean order to kill Charles Horman because he "knew too much" about alleged American involvement in the Chilean coup; the issue is whether the filmmakers intentionally portrayed such a defamatory suggestion, knowing that it was false or with serious doubts of its truth. There is no doubt that Ed Horman, the father of the missing man, asserted such a theory and that assertion is documented in Hauser's book. Plaintiff has not presented evidence that defendants knew the theory of the father was false, or entertained serious doubts as to its truth. There is no evidence that defendants acted with actual malice or disbelieved what the Hormans thought and said or what Hauser wrote.

In sum, returning to the *ratio decidendi;* no provable, clear and convincing, affirmative evidence nor specific facts showing actual malice on the part of the defendants in publishing the alleged defamation have been shown, and the complaint by plaintiff, a public figure, falls as not sustainable under the law.

The complaint is dismissed, with costs.

SO ORDERED.

### APPENDIX

The plaintiff has designated the following nine scenes in the film purportedly as the evidence he has that defendants published the film with actual malice.

#### 1. *Initial Embassy Scene*

The scene depicts a meeting where it is reported that Tower and his staff have conducted interviews in the area where Charles was last seen. Tower states he is having dinner with the Junta's chief-of-staff Admiral Huidobro, implying close connections with the Chilean military, and asks Beth Horman for a list of Charles' friends which was refused.

Every element in the dramatized scene is traceable to an actual fact about or statement by Ray Davis derived from Hauser's book. The book establishes that Ray Davis

was in charge of the American investigation into Charles Horman's disappearance.

### 2. The Hotel Meeting

The film depicts a meeting at the Hormans' hotel at which Putnam, Clay, and Tower are present. Clay states that a fingerprint check made at all the morgues came up negative in the search for Horman's whereabouts and that Captain Tower checked them himself.

The book describes the fingerprint report by governmental officials, and this scene is a composite of those who checked on the morgue and the fingerprints. *Execution* chronicles Ray Davis' statements that he made inquiries with friends in the Chilean military and was checking "all possible leads."

### 3. The Stadium

In this scene the language is taken straight from *Execution;* the scene indicates that Tower and Putnam accompany Ed and Beth Horman to the National Stadium to search for Charles. American official presence at the stadium, including the suggestion that Davis was involved in the investigation into Charles' disappearance, are clearly indicated in Hauser's account. Indeed, *Execution* portrays that Ray Davis was "in charge of the investigation."

### 4. The Final Embassy Meeting

In this scene Ed Horman tells Tower and the Embassy officials that he does not think that the military would kill Charles "unless an American official co-signed a kill order" and further indicates that he believes that American officials knew from the start that Charles was dead. These statements by Horman in the film directly reflect his beliefs as described in Hauser's book and as known to the filmmakers.

### 5. The Airport Scene

In this scene Ed Horman tells Putnam, with Tower standing nearby, "I'm gonna sue you, Phil, and Tower and the Ambassador, and everybody who let that boy die." While the locale for this confrontation is not placed at an airport by *Execution,* the speech accurately depicts Ed Horman's state of mind as described in *Execution.* Horman did sue eleven government officials.

### 6. The Bathroom Scene

This scene shows Beth Horman in the bathtub at Tower's house when Tower walks into the bathroom with a drink in his hand. Tower says, "You know, if I were you, I'd quit living in the past. I think it's about time you started thinking about your future." Tower exhorts Beth to "stay ahead of the power curve" as Beth quickly exits the room.

Each of these events is taken almost directly from Hauser's book. According to Costa-Gavras' affidavit, Joyce Horman told Costa-Gavras that the book's description of events at Ray Davis's home was actually understated and overly charitable to Davis, both in describing how much he had to drink and in detailing precisely what occurred when he entered her bathroom.

### 7. The Meeting with Paris

In this scene, Paris, described as a desperate former employee of the Junta, tells Ed Horman that a friend was present and saw Charles detained at the Ministry of Defense in the office of Chilean General Lutz, after he was arrested. According to the friend, an American official was present in the office when the decision was made that the prisoner "must 'disappear'" because "he knew too much." Paris could not identify the American official but noted that, "The ministry is full of them. Their Milgroup office is just down the hall from the General."

This scene is taken directly from Hauser's book, which describes in detail the allegations of a Chilean defector and former employee of the Chilean Intelligence Service, Rafael Gonzalez.

### 8. The Mafia Speech

Tower analogizes Charles' death with the murder of someone who becomes involved with the Mafia. In fact, plaintiff Ray Davis himself made such a statement and this is documented in *Execution.* Interestingly, these statements were made by Davis to Thomas Hauser while the latter was researching his book.

### 9. The Telephone Repair Scene

This scene contains the suggestion that Ed Horman's telephone at his hotel is wiretapped. A telephone repairman leaves the hotel room and Ed Horman tells him there was nothing wrong with the phone, and Beth is portrayed as saying, "hello Ray Tower, how's every little thing."

*Execution* documents the incident with Ed Horman's clear impression that either the Chilean government or American officials had bugged his phone.

## AMENDED MEMORANDUM

This is a motion by defendants for a discretionary award of costs. On March 4, 1987 this Court entered judgment for defendants Costa-Gavras, Universal Studios, Inc., and MCA Inc. dismissing plaintiff Ray E. Davis's complaint with costs. Defendants have filed a bill of costs pursuant to Local Rule 11 of the Civil Rules for the Southern District of New York; additional costs are sought under Federal Rule of Civil Procedure 54(d) and 28 U.S.C. § 1920.

This libel suit was initiated in January 1983 seeking $150 million in compensatory and punitive damages against defendants, makers of the movie "Missing," and the author and publishers of the book on which the film is based. Plaintiff's entire case has been disposed of on motions at a substantial cost to defendants.

Defendants move for an award of discretionary costs in the amount of $5,268.00: $575.80 for photocopy costs associated with various legal motions filed by defendants on which they prevailed in whole or in part, and $4,693.00 for travel costs incurred by defendants' counsel to attend depositions noticed and taken by plaintiffs, requiring the attendance of counsel outside the City of New York as well as in New York.

"Fees for exemplification and copies of papers necessarily obtained for use in the case" and "[f]ees and disbursements for printing and witnesses" are allowable costs. 28 U.S.C. § 1920. Counsels' fees and expenses in attending the taking of a deposition are taxable upon the order of the Court under Local Civil Rule 11(c)(2).

Defendants' requested photocopy costs of $575.80 are allowed. Defendants' travel costs for necessary attendance outside New York in respect of depositions sought by the plaintiff will also be allowed. The affidavits reflect three such instances. These are the July 8, 1983 depositions of Stewart, Barton, and Daniel requiring defendants' counsel to travel to Los Angeles; the July 14, 1983 deposition of Costa-Gavras requiring defendants' counsel to travel to Paris; and the July 31, 1986 deposition of Donald Stewart requiring defendants' counsel to travel to Los Angeles. Defendants seek $1,078.00 as reimbursement for airfare costs in connection with the first Los Angeles deposition, $1,500.00 reimbursement for airfare costs in connection with the Paris deposition, and $1,185.00 as reimbursement for airfare costs in connec-

tion with the second Los Angeles deposition, totalling $3763.00.

Accordingly, defendants are entitled to a total of $4,338.80 which is allowed to them as costs, to be entered herein in their favor.

SO ORDERED.