Clint EASTWOOD, Plaintiff–Appellee,

v.

NATIONAL ENQUIRER, INC.,
Defendant–Appellant.

Clint EASTWOOD, Plaintiff–Appellant,

v.

NATIONAL ENQUIRER, INC.,
Defendant–Appellee.

Nos. 95–56758, 96–55560.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 1997.

Decided Aug. 25, 1997.

**1250**

Gerson A. Zweifach, Paul Martin Wolff, Steven M. Farina, Paul B. Gaffney, Williams & Connolly, Washington, DC; Henry R. Shields, Irell & Manella, Los Angeles, CA, for defendant-appellant-defendant-appellee National Enquirer, Inc.

Raymond C. Fisher, Kenneth L. Chernof, Edward P. Lazarus, Heather A. MacTavish, Heller Ehrman White & McAuliffe, Los Angeles, CA, for plaintiff-appellee-plaintiff-appellant Clint Eastwood.

Before: FARRIS, KOZINSKI and T.G. NELSON, Circuit Judges.

KOZINSKI, Circuit Judge.

Did defendant falsely represent that plaintiff had given it an interview? Or did it avoid learning that the purported interview was a fabrication? And was the jury right in finding "actual malice"?

Enquiring judges want to know.

\* \* \*

On December 21, 1993, the front page of the *National Enquirer* touted an "Exclusive Interview" with Clint Eastwood. *See* Figure 1. Under the headline "Clint Eastwood at 63: Being a new dad has made my day,"[1] the "interview" featured "quotes" from Eastwood about his relationship with actress Frances Fisher ("I propose marriage to her from time to time and sometimes she says yes and sometimes she says no."), their new baby ("Frances and I ... take turns getting up [in the middle of the night].") and his career ("For me to be ... wiping out tons of people, that's over. I think I'll leave that for the newer guys on the scene."). The by-line of Don Gentile, an *Enquirer* assistant editor, and the inclusion of such phrases as "[Eastwood] said with a chuckle" suggested that the writer and the movie star had conversed. *See* Figure 2.

In fact, Eastwood never spoke to the *Enquirer*; the interview, he claims, is a fabrication. In a suit in Federal District Court, Eastwood alleged that the article misrepresented its origin, association and/or endorsement in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and invaded his privacy and misappropriated his name, likeness and personality under Cal. Civ.Code § 3344 and California common law. The gist of the complaint is that Eastwood's reputation was damaged by the suggestion that he would grant an interview to a sensationalist tabloid.

After a seven-day trial and four days of deliberation, the jury returned a unanimous verdict for Eastwood; it awarded him $150,-000.[2] Pursuant to the Lanham Act and Cali-

---

1. There is, obviously, no claim that the last three words of the headline were exclusive.

2. The jury allocated the award as follows: Damage to Eastwood's reputation, $75,000; profits unjustly obtained by the *Enquirer*, $75,000. The award was not distributed among the three causes of action.

fornia law, Judge Davies awarded Eastwood $653,156 in attorney's fees but denied $185,163 in costs, including expert witness fees. The *Enquirer* appeals the verdict and the fee award. Eastwood cross-appeals the denial of expert fees and other costs.

## I.

Under the rule first announced in *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), a public figure can recover damages from a news organization, for harms perpetrated by its reporting, only by proving "actual malice." This phrase does not mean

> ill will or "malice" in the ordinary sense of the term.... Actual malice, instead, requires ... that the statements were made with a reckless disregard for the truth. And although the concept of "reckless disregard" "cannot be fully encompassed in one infallible definition," we have made clear that the defendant must have made [the decision to publish] with a "high degree of awareness of ... probable falsity," or must have "entertained serious doubts as to the truth of his publication."

*Harte–Hanks Communications v. Connaughton*, 491 U.S. 657, 666–67, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989) (citations and footnote omitted) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)). Thus Eastwood was entitled to prevail if the *Enquirer* knowingly made a false statement that hurt his reputation.

■ Alternatively, he could prevail if the *Enquirer* had "obvious reasons to doubt the veracity" of its reporting, *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326, but engaged in "purposeful avoidance of the truth." *Harte–Hanks*, 491 U.S. at 692, 109 S.Ct. at 2698; *cf. United States v. Jewell*, 532 F.2d 697, 700 (9th Cir.1976) (en banc) (willful blindness tantamount to knowledge). Mere negligence would not be enough. "Even an extreme departure from accepted professional standards of journalism will not suffice to establish actual malice; nor will any other departure from reasonably prudent conduct, including the failure to investigate before publishing." *Newton v. National Broadcasting Co.*, 930 F.2d 662, 669 (9th Cir.1990); *see also St. Amant*, 390 U.S. at 733, 88 S.Ct. at 1326 ("Failure to investigate does not in itself establish bad faith.").

■ The jury here was properly instructed.[3] Nonetheless, we must satisfy ourselves that "actual malice" was proven. This is because " '[j]udges, as expositors of the Constitution,' have a duty to 'independently decide whether the evidence in the record is sufficient to [overcome] the constitutional ... [bar to the entry of any judgment] ... not supported by clear and convincing proof of "actual malice." ' " *Harte–Hanks*, 491 U.S. at 686, 109 S.Ct. at 2695 (quoting *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984)); *see also Bose* at 508 n. 27, 104 S.Ct. at 1964 n. 27 (appellate courts have "an obligation to test challenged judgments against the guarantees of the [First Amendment] ... and in doing so ... cannot avoid making an independent ... judgment on the facts of the case.") (internal quotations omitted).

3. The jury was told:

> [T]he Constitutional protections for speech and press prohibit recovery for false reports of matters of public interest in the absence of proof that the defendant published with knowledge of its falsity or with a high degree of awareness of probable falsity.
>
> To prove actual malice, the plaintiff must prove by clear and convincing evidence that the defendant published the interview with knowledge that it was fabricated or with reckless disregard for whether it was genuine or not.
>
> A reckless disregard for the truth requires more than a departure from reasonably prudent conduct. Reckless disregard is not shown by sloppy journalism, carelessness, or gross negligence. Even an extreme departure from accept-

> ed professional standards of journalism will not suffice to prove actual malice.
>
> Rather, to prove actual malice the plaintiff must provide clear and convincing proof that the defendant in fact entertained serious doubts as to whether the interview was genuine, or actually had a high degree of awareness of probable falsity. This is a subjective test focusing on defendant's state of mind at the time of publication.
>
> You may consider circumstantial evidence in determining whether the plaintiff has established actual malice by clear and convincing proof. You may, but need not, find actual malice if you conclude that the defendant had obvious reasons to doubt the genuineness of the interview but purposefully avoided the truth.
>
> Reporter's Transcript, October 16, 1995, at 1583–84.

In conducting our review, it is not enough for us to determine that a reasonable jury could have found for the plaintiff—a kind of sufficiency-of-the-evidence test, *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), permitting us to affirm even though we would have reached a different conclusion. Rather, "First Amendment questions of 'constitutional fact' compel [us to conduct a] *de novo* review." *Bose*, 466 U.S. at 508 n. 27, 104 S.Ct. at 1964 n. 27. We ourselves must be convinced that the defendant acted with malice.

This does not mean we give jury findings no weight; on questions of credibility, which the jury is uniquely qualified to answer, we defer. *See Newton*, 930 F.2d at 671 ("[W]e read *Bose* and *Harte–Hanks* as creating a 'credibility exception' to the *New York Times* rule of independent review."). Thus we have described our role as simultaneously " 'examin[ing] for ourselves' the factual record in full" and "accord[ing] credibility determinations the special deference to which they are entitled." *Newton*, 930 F.2d at 671 (quoting *New York Times*, 376 U.S. at 285, 84 S.Ct. at 728–29). Put another way, we must figure out, as best we can from the cold record, which evidence the jury accepted as credible, and which it discarded. Then we must determine whether the *believed* evidence establishes actual malice.

This is no doubt a difficult business. Without a transcript of the jury's deliberations, we can only guess which facts (aside from those essential to the verdict) it must have believed.[4] In another case, this task might well prove impossible, forcing us to rethink our deferential-yet-de-novo approach. *Cf.*

4. Interrogatories, which might have helped us understand the jury's reasoning, *see* Fed.R.Civ.P. 49(b), were not used in this case; *cf. Harte–Hanks*, 491 U.S. at 690, 109 S. Ct. at 2697 (relying on answers to special interrogatories in determining what the jury "must have" decided).

5. We have recognized the difference between these standards in a variety of contexts; commonly, "clear and convincing" is a means of protecting society from the consequences of grave decisions too lightly reached. *See, e.g., United States v. Restrepo*, 946 F.2d 654, 659–60 (9th Cir.1991) (en banc) (suggesting that a clear and convincing standard should be applied to facts that will dramatically increase a criminal sentence).

*Harte–Hanks*, 491 U.S. at 700, 109 S.Ct. at 2702 (Scalia, J., concurring) ("I would ... mak[e] our independent assessment of whether malice was clearly and convincingly proved on the assumption that the jury made all the supportive findings it reasonably could have made."). Here, however, enough key facts are undisputed that we can reach a conclusion without interviewing—or ignoring—the jury. *See* note 12 *infra*.

The purpose of our review is to satisfy ourselves that plaintiff proved malice by clear and convincing evidence, *Harte–Hanks*, 491 U.S. at 686, 109 S.Ct. at 2695 (quoting *Bose*, 466 U.S. at 511, 104 S.Ct. at 1965), which we have described as a "heavy burden," *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir.1985), far in excess of the preponderance sufficient for most civil litigation.[5] In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the Court reasoned that the important First Amendment interests present in suits against news organizations justified this heightened burden of proof. "[T]he possibility of ... error [in such cases] would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate." *Id.* at 50, 91 S.Ct. at 1823. This is no less true if the publication is a tabloid; the size of the page does not diminish the constitutional protection afforded the content. *See Desnick v. American Broadcasting Companies*, 44 F.3d 1345, 1355 (7th Cir.1995) (Posner, C.J.).

Nonetheless, even a properly instructed juror may have difficulty gauging whether a proposition was proven by clear and convincing evidence, or merely by a preponderance.

As Justice Brennan explained:
> In all kinds of litigation it is plain that ... the burden of proof ... may be decisive of the outcome. There is always in litigation a margin of error.... Where one party has at stake an interest of transcending value ... this margin of error is reduced as to him by the process of [adjusting] the burden of ... proof....

*Speiser v. Randall*, 357 U.S. 513, 525–26, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958) (citations omitted). The decision to hold a publisher liable for damages based on the content of a news report is one such situation, given the "transcending" value of an unencumbered press.

*See Tippett v. Maryland*, 436 F.2d 1153, 1158–59 (4th Cir.1971) ("However meaningful the distinction [between clear and convincing evidence and a preponderance] may be to us as judges, ... it is greatly to be doubted that a jury's verdict would ever be influenced by the choice of one standard or the other."). The task is somewhat easier for judges. *See United States v. Fatico*, 458 F.Supp. 388, 410 (E.D.N.Y.1978) (judges, in survey, in general agreement on interpretation of burdens of proof). Thus it falls to us to decide if the heightened standard was met. If the jury could only have found "actual malice" by a preponderance, we must reverse.

## II.

As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence. By examining the editors' actions we try to understand their motives.

**A.** Eastwood first asserts that the interview never took place at all—it was a fabrication. The *Enquirer*'s "exclusive interview" first appeared in *Today*, a British tabloid. *Enquirer* article editor Steve Plamann phoned *Today*, only to learn that a freelance writer, Cameron Docherty, was the source of the interview and had retained the rights. Plamann phoned Docherty, who "confirmed" that he had interviewed Eastwood. Plamann did not ask when and where the interview took place, nor did Docherty volunteer this information. Docherty told Plamann he had taped the interview but had erased the tapes.

Plamann again phoned *Today;* he testified that an assistant features editor, Sharon, told him that Docherty had done "good work" and that "there never had been any complaints about" his stories. Brief of Appellant at 9–10. However, Plamann never obtained Sharon's last name, nor did he ask if she had ever worked with Docherty. Next, Plamann

called Jerry Pam, a Hollywood press agent who once represented Eastwood, purportedly to ask about Docherty's credentials. Pam was moving that day and Plamann did not reach him. A secretary who answered the phone said—quite ambiguously—"We know Docherty."

In the meantime, Plamann had his staff see what the *Enquirer*'s competitors had been saying about Eastwood—a process known to tabloid editors as a "playcheck." The playcheck revealed that the *Star* (a tabloid under the same ownership as the *Enquirer*) had recently run an article by Cameron Docherty containing identical quotes from Eastwood. Plamann phoned Docherty, who claimed he had interviewed Eastwood again after the *Star* interview appeared and had combined new and old material for the *Today* piece.[6]

Finally, the story was referred to the *Enquirer*'s outside counsel, David Kendall, for pre-publication review. Kendall performed no new investigation. In giving the *Enquirer* approval to run the piece he considered mainly that similar reporting had been published elsewhere without complaint,[7] and that the article "was a very sympathetic account of his becoming a father at the age of 63." Brief of Appellant at 14. It is fair to say that what Kendall did was satisfy himself that the *Enquirer* would probably not get sued, largely because, in his view, nothing in the article cast Eastwood in an especially negative light.[8]

As the *Enquirer* views these facts, it had little reason to doubt Docherty's story: *Today* "is a reputable daily newspaper, reporting on national affairs, matters of local interest, financial developments, sports, and entertainment news," Brief of Appellant at 6; Plamann—"who earned a journalism degree from the University of Wisconsin," *id.* at 7—found that the interview "rang true" because it was consistent with other published articles about Eastwood; and Kendall

---

**6.** The existence of the *Star* interview decreased the value of the *Enquirer*'s "exclusive" yet increased Plamann's confidence that Docherty was on the level; Eastwood had—to the best of Plamann's knowledge—not complained to the *Star*.

**7.** Eastwood notes that, in the case of *Today*, the interview had only been on the stands for a

couple of days; thus it was too soon for Plamann and Kendall to infer anything from his apparent failure to complain.

**8.** The most "negative" fact in the article is that Eastwood sometimes drinks Scotch; he told the jury that he prefers beer and wine.

has sufficient tabloid experience to have reliably concluded that the interview was on the level.

Eastwood takes a very different view, arguing that the *Enquirer* had plenty of reason to suspect that the Docherty interview was fake: First, he contends, *Today* is not a reputable paper but a "sensationalist tabloid much like the *Enquirer*." Brief of Appellee at 10. Second, Docherty provided no corroborating details of the interview, and—suspiciously for someone peddling an interview with a litigious mega-star—claimed he'd erased the tapes. In addition, the *Enquirer*'s editors must have known that Eastwood never gave interviews without retaining some control over the time and place of publication—a policy which would have precluded speaking to a freelancer like Docherty.[9] Finally, Eastwood points out that at least one assertion in the Docherty interview, that Eastwood "never work[ed] out," directly contradicted a celebrity fitness story that the *Enquirer* had run just a few weeks before, and which Plamann was almost certainly aware of.

For all these reasons, Eastwood argues, Plamann must have had serious subjective doubts about the interview, which his conversations with Docherty could not have assuaged. But the *Enquirer* claims that it made a legitimate effort to satisfy itself the interview was real before making the final decision to publish. Plamann, after all, called *Today* and Pam not knowing what he would hear. Thus, according to the *Enquirer*, it did not engage in "purposeful avoidance."

In Eastwood's view, Plamann's calls were intended to create the appearance of investigation, without running the risk of uncovering anything. In calling *Today*, Eastwood contends, Plamann accepted a cursory answer from the first person he spoke to; he did the same in his call to Jerry Pam. That he then exaggerated what he was told in both cases, *see* note 12 *infra*, suggests that the calls were designed to cover his mass circulation publication.

Eastwood makes much of the *Enquirer*'s failure to call him or any of his representatives to ask whether the interview took place.[10] But even without phoning Eastwood or one of his reps, there is plenty more the *Enquirer* could have done: It could have refused to buy the interview if Docherty could not produce tapes—or a photo or a witness—placing him with Eastwood. It could have asked Docherty more about where and when the interview occurred, and who arranged it. From the answers to these questions, it might well have figured out Docherty was lying.[11] Indeed, given the *Enquirer*'s desire to make the interview seem up close and personal by inserting scene-setting language, it's hard to imagine a diligent editor not asking Docherty to describe exactly Where and When (two of the five "W's" of journalism) the meeting had happened. That the editor here didn't, supports Eastwood's argument that the *Enquirer* was taking a see-no-evil, hear-no-evil tack. And, of course, Plamann could have asked to speak to someone at *Today* besides the surnameless Sharon, and made more of an effort to locate the out-of-the-office, but not-out-of-the-country, Jerry Pam.

We therefore believe that a preponderance of the evidence supports the jury's verdict;

9. Docherty's later assertion that he had interviewed Eastwood twice is, to Eastwood's lawyers, preposterous. In their view, one Docherty–Eastwood interview stretches credulity; two Docherty–Eastwood interviews would tip off a corpse.

10. To Eastwood, this is proof that the *Enquirer* wanted to avoid learning the truth. (The *Enquirer* admits it has phone numbers for Eastwood on file.) There was, however, no requirement that the *Enquirer* make such a call, *cf. Secord v. Cockburn*, 747 F.Supp. 779, 789 (D.D.C.1990) (plaintiff cannot rely on defendant's failure to consult with him prior to publication as proof of "actual malice"); *Davis v. Costa–Gavras*, 654

F.Supp. 653, 657 (S.D.N.Y.1987) ("[P]laintiff cannot prove actual malice merely by asserting that a publisher failed to contact the subject of his work."), and at least one good reason not to: Given the bad blood between Eastwood and the *Enquirer, see Eastwood v. Superior Court*, 149 Cal.App.3d 409, 413–16, 198 Cal.Rptr. 342 (1993) (describing Eastwood's earlier suit against the *Enquirer*), Plamann could not have expected to obtain reliable information from Eastwood's camp.

11. With its network of stringers and paparazzi, the *Enquirer* frequently knows the whereabouts of stars as newsworthy as Eastwood.

that is to say, the *Enquirer* more likely than not did what Eastwood says it did. But a preponderance is not enough. A number of facts—that similar material had been published in two other publications, which apparently were satisfied that Docherty was on the level; that two people who knew Docherty slightly suggested his work was okay; that most of the material in the interview was consistent with what Plamann knew about Clint Eastwood—support the view that the *Enquirer*'s editors could have believed the interview was genuine. Therefore, we cannot say that Eastwood established, by clear and convincing evidence, that the *Enquirer* published the interview knowing it was false.[12]

■ **B.** Eastwood presented an alternate theory [13] under which he could show malice even if the *Enquirer* editors believed the interview was genuine. Eastwood contended at trial that the defendant misdesignated the interview by labeling it "Exclusive," and by

signalling, through text and graphics, that he had willingly talked to the *Enquirer*. Because it is undisputed that Eastwood did not consent to be interviewed by the *Enquirer*, Eastwood could succeed on this theory even if he had, in fact, been interviewed by Cameron Docherty.[14]

Did the *Enquirer* editors mislabel the interview as having been given to *them* by Clint Eastwood? The interview is marked "Exclusive" in three places—on the cover, near the top of page 5 (in bold, underlined, uppercase type, lest anyone overlook it), and in the article itself ("In an exclusive interview, the superstar gave a rare glimpse of his private life.").[15] The *Enquirer* explains that—among magazine editors—"exclusive" means only "no one else is publishing this article in our market." Moreover, it argues, *Cher v. Forum International*, 692 F.2d 634 (9th Cir.1982), requires us to accept the labeling of an interview originally intended for another outlet as "exclusive." But even if *Cher* applies—which is doubtful [16]—there is

12. Eastwood claims "[t]he jury's verdict was in significant part a judgment on Plamann's credibility," Brief of Appellee at 9, but we have not found questions of credibility crucial to our decision because the following facts, around which the question of "actual malice" turns, are undisputed: Similar material ran in *Today*, without any apparent complaint by Eastwood; similar material ran in the *Star*, without any apparent complaint by Eastwood; Plamann spoke to an assistant editor at *Today*, who said nothing alarming; Plamann spoke to Jerry Pam's secretary, who said nothing alarming; much of the material in the putative interview rang true.

Plamann did dissemble on at least two points *prior* to trial: First, he claimed at a deposition that "Sharon" at *Today* told him that *Today* had decided to publish the article after listening to Docherty's tapes. Second, after speaking to Jerry Pam's secretary, he wrote that the secretary said Pam had arranged for Docherty to interview Eastwood. Neither statement is true, and both appear calculated to mask the odor of purposeful avoidance.

The jury thus had a basis for concluding that Plamann was a less-than-reliable witness. However, this finding alone cannot establish actual malice. *Cf. Newton*, 930 F.2d at 671 ("Although discredited testimony 'does not rebut any inference of actual malice that the record otherwise supports, ... it is equally clear that it does not constitute clear and convincing evidence of actual malice.'" (quoting *Bose*, 466 U.S. at 512, 104 S.Ct. at 1966)). Nor, obviously, can it undermine those aspects of defendant's case that the plaintiff conceded at trial.

13. We read the jury instruction as permitting a finding on this ground. *See* Reporter's Transcript, October 16, 1995, at 1583.

14. The *Enquirer* does not dispute that, as a matter of state law, an individual can be defamed by the suggestion that he granted an interview to a publication when he in fact did not consent to be interviewed by that publication.

15. The fuzzy photo of Eastwood's baby is also labeled "exclusive," *see* Figure 2; it, too, was not intended for publication in the *Enquirer*, but that's another story. *See* Reporter's Transcript, October 11, 1995, at 1123–28. In a deposition that reads like something out of *Day of the Locust*, Frances Fisher testified that, at a movie premiere, she took a baby photo out to show one of the Baldwin Brothers, and at that instant several photographers swooped in, taking photos of the snapshot. The *Enquirer* photo is, by her account, a blow-up of a close-up of a snapshot never meant for public consumption. It looks it.

16. *Cher* pertains only to quotations not previously published. *See* 692 F.2d at 638 ("*Star* was entitled to inform its readers that the issue contained an article about Cher, that the article was based on an interview with Cher herself, and that the article had not previously appeared elsewhere."). The *Enquirer* knew the Eastwood interview had previously appeared elsewhere. Thus, its use of "Exclusive" does not fall under the *Cher* umbrella.

more here than the word "exclusive." [17] The *Enquirer* gave the by-line (or, more properly, the tag-line) to Don Gentile, who is identified in the same issue as an assistant editor at the *Enquirer*.[18] It inserted scene-setting phrases. It quoted Eastwood in the "simple past" tense; using "Eastwood has said" instead of "Eastwood said" would have informed readers that the statement was not directed to the article's purported author. (For that matter, using "Eastwood told freelance writer Cameron Docherty" would have eliminated any ambiguity whatever.) And it labeled a baby picture "Exclusive Photo"—hinting at access to Eastwood. *See* Figure 2.

We are not suggesting that any one of these things is dispositive (or, conversely, that the *Enquirer* would have solved the problem with a single alteration). Rather, we look to the totality of the *Enquirer*'s presentation of the interview and find that the editors falsely suggested to the ordinary reader of their publication—as well as those who merely glance at the headlines while waiting at the supermarket checkout counter—that Eastwood had willingly chatted with someone from the *Enquirer*.

Of course, under *New York Times v. Sullivan*, it is not dispositive that most, even all, of the *Enquirer*'s readers believed Eastwood had granted an interview to the *Enquirer*; there is no actual malice where journalists unknowingly mislead the public. *Bose*, 466 U.S. at 513, 104 S.Ct. at 1966 (warning that absent the subjective test, "any individual using a malapropism might be liable ... even though he did not realize his folly at the time"). To affirm, we must find the editors knew or should have known that their statements would be misleading.

In this case, there was testimony that the *Enquirer* uses a kind of code, applying the label *"Enquirer* Interview" where an interview is given to the *Enquirer* directly, and "Exclusive Interview" where it is not. Assuming the truth of this testimony,[19] we do not believe the absence of the phrase *"Enquirer* Interview" would inform the average reader (or the average browser) that the subject had not spoken to the *Enquirer*, or that the editors could have believed their code sufficient for that purpose.[20] Rather, we find, from the totality of their choices, that the editors intended to convey the impression—known by them to be false—that Eastwood wilfully submitted to an interview by the *Enquirer*. This intentional conduct satisfies the "actual malice" standard, permitting a verdict for Eastwood.

### III.

■ After hearing testimony on Eastwood's extensive efforts to preserve his privacy, the jury awarded $150,000. The *Enquirer* claims this award lacked support in the record. But the jury could have found that Eastwood's fans would think him (1) a hypocrite for giving the *Enquirer* an "exclusive interview" about his private life (plus access to an "exclusive" baby picture), and/or (2) essentially washed up as a movie star if he was courting publicity in a sensationalist tabloid. This would have been sufficiently damaging to Eastwood's reputation to support an award of this magnitude. *See Waits v. Frito-Lay*, 978 F.2d 1093, 1104 (9th Cir. 1992) (jury was entitled to award singer Tom Waits $75,000 in compensatory damages because it "could have inferred from the evidence that the [defendant's] commercial [featuring an imitation of Waits' voice] created a public impression that Waits was a hypocrite

---

**17.** Which is why we must reject the *Enquirer's* argument, *see* Brief of Appellant at 53, that so long as Kendall read *Cher* as permitting the *Enquirer* to use the label "Exclusive," "that ends the inquiry."

**18.** The *Enquirer* points out that publications that employ in-house rewriters (including *Time* ) commonly credit the rewriters. But there is no evidence that they ever put staff by-lines on articles that first appeared in other publications.

**19.** The record suggests that the practice may not have been consistently followed.

**20.** The *Enquirer* argues this claim is foreclosed by *Newton*. In *Newton*, we held that a publication could not be held liable on the ground that it "should have foreseen" that its words would be interpreted in a defamatory manner. 930 F.2d at 680. But we're not merely finding that the *Enquirer* editors "should have foreseen" a defamatory interpretation. We are finding, based on the evidence presented at trial, that they did foresee it. The fact that we can't look inside the editors' minds doesn't stop us from reaching conclusions about their thoughts; subjective standards are nearly always satisfied by circumstantial proof (as in most criminal prosecutions).

for endorsing Doritos."); *cf. Carol Burnett v. National Enquirer,* 144 Cal.App.3d 991, 1016, 193 Cal.Rptr. 206 (Cal.Ct.App.1983) (evidence of plaintiff's public image and *Enquirer*'s wide readership supported award of $50,000 in damages for injury to reputation).[21]

## IV.

Eastwood's fee application was filed 33 days after entry of judgment; exclusion of Thanksgiving weekend whittled the 33 days down to 29.[22] Under Federal Rule of Civil Procedure 54(d)(2)(B), fee applications must be filed within 14 days of entry of judgment, "[u]nless otherwise provided by statute or order of the court." In the Central District of California, however, Local Rule 16.10 provides: "Any motion or application for attorney's fees shall be served and filed within thirty (30) days after the entry of judgment or other final order, unless otherwise ordered by the Court." Eastwood's application was timely under this rule.

The *Enquirer* argues that the shorter time limit of Fed.R.Civ.P. 54 controls. However, we agree with the district court that local Rules are standing court orders for purposes of Rule 54(d). *See Johnson v. Lafayette Fire Fighters Ass'n Local 472,* 51 F.3d 726, 729 (7th Cir.1995). We are not persuaded otherwise by the unpublished memorandum in *Novacolor, Inc. v. Turner Broadcasting Sales, Inc.,* No. CV 93–6574 AWT, 1995 U.S. Dist. LEXIS 15610, at *2 (C.D.Cal. Oct. 18, 1995).

## V.

In deciding whether to include costs in Eastwood's fee award, the district court was bound by California law, *see Intel Corp. v. Hartford Accident and Indemnity,* 952 F.2d 1551, 1556 (9th Cir.1991); it was required to predict how the California Supreme Court would decide the question. In making what amounts to an educated guess—that the fee-shifting provision of Cal. Civ.Code § 3344 does not encompass costs—Judge Davies chose to follow a recent decision of the Third Appellate Division over two earlier opinions of the First Division. The recent decision, *Ripley v. Pappadopoulos,* 23 Cal. App.4th 1616, 28 Cal.Rptr.2d 878 (Cal.Ct. App.1994), held that because Cal.Civ.Proc. Code § 1033.5(b)(1) specifically excludes expert witness fees from the list of recoverable costs, such costs are not recoverable as fees. To hold otherwise, according to the *Ripley* court, would be to ignore the language of the statutes. *See id.* at 1626, 28 Cal.Rptr.2d 878 ("In the absence of some specific provision of law otherwise, ... attorney fees do not include ... costs and costs do not include attorney fees."). In addition to being the latest word on the subject, *Ripley* is firmly grounded in the Supreme Court's interpretation of a similar fee-shifting provision. *See West Virginia Univ. Hosp. v. Casey,* 499 U.S. 83, 91–92, 111 S.Ct. 1138, 1143, 113 L.Ed.2d 68 (1991) (listing numerous expense-shifting provisions where Congress expressly provided for the recovery of expert witness fees, and concluding: "[T]his statutory usage shows beyond question that attorney's fees and expert fees are distinct items of expense."). Although we conduct a de novo review of the district court's determination of California law, we see no reason to disturb Judge Davies' ruling.[23]

**AFFIRMED.**

---

21. The *Enquirer* does not contest the availability of damages under the Lanham Act. Nor does it argue that the other half of the award, premised on its ill-gotten gains, is unsupported.

22. Judge Davies reviewed the schedule and operations of the Clerk's office in the Central District of California before excluding the four days. In particular, he found that "substantial impediments prevented Eastwood from filing the application on" the day after Thanksgiving. Order Denying Defendant's Motion to Strike Attorney's Fees Application as Untimely, December 20, 1995, at 2 n.1. We accept this factual finding.

23. Eastwood argues that Judge Davies was mistaken, in part because the statute at issue in *Casey,* the fee-shifting provision of 42 U.S.C. § 1988, was later amended by Congress to allow reimbursement of expert witness fees. *See Stender v. Lucky Stores,* 780 F.Supp. 1302, 1306 n. 13 (N.D.Cal.1992) (describing "legislative[ ] revers[al]" of *Casey* ). Eastwood states: "[I]n relying on *Ripley,* the District Court sat on a chair whose legs had been removed." Brief of Plaintiff–Appellee/Plaintiff–Appellant at 65. He's wrong; Congress' action supports the view that the type of statutory language at issue in *Casey* and *Ripley* excluded expert witness fees.

FIGURE 1

## FIGURE2

Tough-guy actor Clint Eastwood reveals his new-born daughter has turned him into an old diaper-changing softy ... and he *couldn't* be happier!

# Clint Eastwood at 63: Being a new dad has made my day

**EXCLUSIVE INTERVIEW**

*Dirty Harry lifts the lid on his private life*

◆ Why he's not married
◆ Why his 'tough guy' days are over
◆ Why he's a sex symbol
◆ What he really thinks of women