**D.A.R.E. AMERICA, a California nonprofit corporation; Glenn Levant, Plaintiff,**

v.

**ROLLING STONE MAGAZINE, whose legal name is Straight Arrow Publishers Co., a corporation; Jann Wenner; Robert Love; Does, 1 through 10 inclusive, Defendants.**

**No. CV 99–1132 VAP CTX.**

United States District Court, C.D. California.

April 27, 2000.

Louis R Miller, Talin V Yacoubian, Christensen Miller Fink Jacobs Glaser Weil & Shapiro, Los Angeles, CA, for plaintiffs.

Kelli L Sager, Alonzo B Wickers, IV, Davis Wright Tremaine, Los Angeles, CA, Victor A Kovner, Elizabeth A McNamara, Carolyn K Foley, Anke E Steinecke, Davis Wright Tremaine, New York City, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PHILLIPS, District Judge.

Defendants' Motion for Summary Judgment came before the Court for hearing on April 17, 2000. After reviewing and considering the materials filed by the parties and the arguments of counsel in support of and in opposition to the Motion, the Court rules that Defendants' Motion is GRANTED.

## I. BACKGROUND

### A. The Parties

D.A.R.E. ("Drug Abuse Resistance Education") is a non-profit corporation founded in 1983 as a cooperative effort of the Los Angeles Police Department and the Los Angeles Unified School District. Its mission is to provide in-class drug education, as well as to establish "positive relationships" between law enforcement and the community, particularly with parents, teachers and students. [Second Amended Complaint ("SAC") at 3.] Glenn Levant is the organization's President and Founding Director. [SAC at 3.] *Rolling Stone* magazine is a journal of popular music and culture, including politics and social issues. Jann Wenner is its publisher and editor; Robert Love is its managing editor. [SAC at 4.]

### B. *Rolling Stone* Contacts Stephen Glass

In the spring of 1997, Love contacted Stephen Glass, a journalist then working for *The New Republic* magazine, about the possibility of writing for *Rolling Stone*. [Defendants' Motion for Summary Judgment ("Defs.' Mot.Summ.J.") at 4; Plain-

tiffs' Opposition ("Pls.' Opp'n") at 7.] *The New Republic* had recently published an article by Glass entitled "Don't You D.A.R.E.," which was critical of the D.A.R.E. program and Levant. That article prompted two angry responses from Levant, which were published in the April 7, 1997 and August 4, 1997 issues of *The New Republic,* and charged that Glass's article was unfairly slanted and contained false and defamatory statements. [Pls.' Opp'n at 7.]

Glass agreed to write an article for *Rolling Stone* based on "Don't You D.A.R.E.," but first prepared a piece on the *U.S. News and World Report* college ranking issue, which was published in *Rolling Stone's* October 17, 1997 issue after "proceeding through the editorial and fact-checking process without incident." [Defs.' Mot.Summ.J. at 4.]

## C. Glass Authors "Truth and D.A.R.E."

Several months later, Glass told Love that Levant was publishing a new book entitled *Keeping Kids Drug Free.* This provided the impetus for publication of Glass's D.A.R.E. story for *Rolling Stone.* [Defs.' Mot.Summ.J. at 5; Pls.' Opp'n at 8.]

Glass's article, "Truth and D.A.R.E.," described the D.A.R.E. program and Levant's new book. It then examined research suggesting that the program's methods are ineffective, and queried why such research had not adversely affected the program's growth and influence. [Defs.' Mot.Summ.J. at 5; Pls.' Opp'n. at 9.] The article described D.A.R.E.'s efforts to "silence" or "suppress" a study of the program commissioned by the National Institute of Justice ("NIJ") and conducted by researchers at the Research Triangle Institute ("RTI"). [Defs.' Mot.Summ.J. at 5.] The article also discussed efforts to influence NBC not to produce an installment of its "Dateline: NBC" program critical of D.A.R.E., and described three instances when D.A.R.E.'s supporters attempted to "punish" researchers by false accusations of drug use, tire slashing, and threatening telephone calls. [Defs.' Mot. Summ.J. at 6; Pls.' Opp'n at 9–10.]

With the exception of Glass's description of Levant's new book, the material in "Truth and D.A.R.E." had been previously published, and in many respects was a shorter version of the 1997 *New Republic* article. [Defs.' Mot.Summ.J. at 6; Pls.' Opp'n at 8.]

Before *Rolling Stone* published "Truth and D.A.R.E.," the article was subjected to review by the magazine's Research Department. [Defs.' Mot.Summ.J. at 6; Pls.' Opp'n. at 10.] Gina Zucker devoted one full work week to fact-checking the article; she referred to articles in the magazines *Reason* and *Sociological Focus,* as well as a piece from *USA Today,* to corroborate some of Glass's assertions. [Defs.' Mot. Summ.J. at 8.] Zucker reviewed Glass's documentary sources for accuracy and spoke with several of Glass's individual sources to confirm the information they had given him. [Defs.' Mot.Summ.J. at 8–9.] To corroborate the quotes and descriptions of incidents Glass obtained from confidential sources, Zucker relied on Glass's handwritten notes and requested that he contact some of these sources again to verify further the accuracy of their representations. [Defs.' Mot. Summ.J. at 9; Pls.' Opp'n at 10–11.]

"Truth and D.A.R.E." appeared in the March 5, 1998 issue of *Rolling Stone.* [Defs.' Mot.Summ.J. at 1.]

## D. Fabrications In Glass's Work Revealed

On May 11, 1998, *The Washington Post* reported that Glass had fabricated portions of "Don't You D.A.R.E." [SAC at 9; Defs.' Mot.Summ.J. at 10; Pls.' Opp'n at 12.] *The New Republic* fired Glass, and it was soon learned that he had systematically fabricated and embellished portions of his published work. [Defs.' Mot.Summ.J. at 10; Pls.' Opp'n at 12.]

At Love's direction, Perry Van der Meer, an assistant managing editor at *Rolling Stone,* investigated each article Glass wrote for the magazine and hired an independent fact-checker to assist in this

effort. [Defs.' Mot.Summ.J. at 11; Pls.' Opp'n at 13.] *Rolling Stone* concluded that "Truth and D.A.R.E." contained false quotations and fabrications. [Defs.' Mot. Summ.J. at 11.]

In its July 9–23, 1998 double issue, *Rolling Stone* published a letter from Levant complaining about "Truth and D.A.R.E." It also printed an Editor's Note stating that the magazine was investigating all articles Glass had written, and intended to re-check Glass's sources. The Note stated, "[t]o date, however, we have found nothing to contradict the essence of this piece." [Defs.' Mot.Summ.J. at 11; Pls.' Opp'n at 13.]

In its August 6, 1998 issue, *Rolling Stone* reported the findings of its inquiry in a second Editor's Note, modeled after a similar note that appeared in *The New Republic*'s June 30, 1998 issue. This second Note stated the magazine's conclusion that Glass had included false quotations and fabrications in both articles he wrote for *Rolling Stone,* including "Truth and D.A.R.E." [Defs.' Mot.Summ.J. at 11; Pls.' Opp'n. at 15.]

## II. PROCEDURAL HISTORY

### A. Plaintiffs' Complaint

On February 2, 1999, Plaintiffs D.A.R.E. America and Levant filed suit in diversity against Defendants *Rolling Stone* magazine (whose legal name is Straight Arrow Publishers Co., LP), Wenner, and Love. Plaintiffs amended their complaint twice. The Second Amended Complaint states three claims for defamation under California law, based on publication of "Truth and D.A.R.E." and the two Editor's Notes. [SAC at 10, 12, 13.]

Plaintiffs allege that "Truth and D.A.R.E." contained eight "specific defamatory" fabrications charging "that D.A.R.E. and Levant operate as a criminal enterprise by engaging in acts of coercion, intimidation, and suppression, and by making threats and causing physical harm" to its detractors. [SAC at 1–2, 7.] Plaintiffs allege that Defendants published "Truth and D.A.R.E." despite their awareness of

Plaintiffs' objections to Glass's 1997 article in *The New Republic.*

Plaintiffs attack the following statements from "Truth and D.A.R.E.":

1. "But what's even more disturbing is that the organization, its supporters and the crusading ex-cop who leads it have tried to silence critics, suppress scientific research and punish nonbelievers."

2. "Academics and parents' groups say Levant's D.A.R.E. uses strong-arm tactics to suppress damaging research. They accuse D.A.R.E. supporters of wielding political pressure, slashing scientists' tires, making threatening phone calls in the middle of the night, harassing critics' children and even of jamming the television transmission of a news report to hush criticism."

3. "D.A.R.E. and its advocates have become so well known for playing hardball with critics that drug researchers and journalists have developed a vocabulary for the events. Anyone who has been silenced, they say, has been 'D.A.R.E.'d.' "

4. " 'Everything was going along just fine,' explains a researcher who worked on the RTI analysis and who asked that his name not be used so he wouldn't get any more 'nasty, screeching phone calls' in the middle of the night. 'That is, until we started finding out that D.A.R.E. just simply didn't work. Then all hell broke loose.' "

5. "One person close to the research added: 'For the first time I can remember, we were scared to publish a study'. D.A.R.E. tried to scare out science."

6. "At an Illinois college a professor who criticized the program was accused by D.A.R.E. supporters of trying to sell drugs to campus students. Although a department investigation cleared him of all wrongdoing, the

professor says he will never look into the program again."

7. "Likewise, a California professor says his department chairman won't let him study D.A.R.E. anymore, because local D.A.R.E. officials have written letters to grants organizations saying the professor's department supports drug use."

8. "And a New York Graduate student says that she changed her sociology dissertation—after two and a half years of work—when D.A.R.E. supporters threw a rock through her window of her office and left a note saying, 'That's not all we'll break—drug pusher!' Her research indicated that D.A.R.E. makes kids less scared of drugs, since it teaches them about drug culture."

[Pl.'s Opp'n at 9–10; Declaration of Ronald Guttman ("Guttman Decl."), Ex. J ("Truth and D.A.R.E" article).]

According to Plaintiffs, *Rolling Stone* further libeled D.A.R.E. in the Editor's Notes by "acknowledging that only three specific threats were invented," and thus "purposely conveyed to its readers that the remainder of the 1998 Article was truthful, accurate, and documented...." [SAC at 9.]

## B. Defendants' Motion For Summary Judgment

On March 27, 2000, Defendants filed a Motion for Summary Judgment, arguing:

(1) Despite engaging in "months of searching discovery," Plaintiffs cannot prove by clear and convincing evidence that Defendants acted with actual malice by publishing "Truth and D.A.R.E." and the Editor's Notes with knowledge or at least a reckless disregard of their falsity. [Defs.' Mot. Summ.J. at 2, 12–27.]

(2) Four of the statements alleged by Plaintiffs to be defamatory are "true or substantially true," thus precluding Plaintiffs from stating a proper defamation claim. [Defs.' Mot.Summ.J. at 2, 28–30.]

(3) The four remaining statements at issue cannot provide the basis for a valid claim by D.A.R.E. and Levant because they do not satisfy the "of and concerning" element of the tort of defamation. [Defs.' Mot.Summ.J. at 3, 33–35.]

On April 3, 2000, Plaintiffs filed Opposition to the Motion, arguing that Defendants misstate the standard for summary judgment in a defamation case, [Pls.' Opp'n at 2, 15–17], and that four genuine issues of material fact prevent summary judgment for Defendants: (1) whether *Rolling Stone* had an employer-employee relationship with Glass, and hence is vicariously liable for his actions, [Pls.' Opp'n at 3, 17–21]; (2) whether *Rolling Stone* acted with actual malice in publishing "Truth and D.A.R.E." and the two Editor's Notes, [Pls.' Opp'n at 3–5, 21–28]; (3) whether the allegedly defamatory statements in the article and Editor's Notes are substantially true, [Pls.' Opp'n at 3, 5, 32–35]; and (4) whether the statements in the article and Editor's Notes "concern" D.A.R.E. and Levant for purposes of stating a defamation claim. [Pls.' Opp'n at 3, 5, 28–31.]

On April 10, 2000, Defendants filed a Reply.

## III. LEGAL STANDARDS

### A. Legal Standard For Summary Judgment

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment. *Margolis v. Ryan,*

140 F.3d 850, 852 (9th Cir.1998); *Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.*, 707 F.2d 1030, 1033 (9th Cir.1983). In this case, Defendants bear the initial burden of identifying the elements of the claim or defense and evidence they believe demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The burden then shifts to the nonmoving party—here, Plaintiffs—to show that there is a genuine issue of material fact that must be resolved at trial. Fed.R.Civ.P. 56(e); *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. The nonmoving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552; *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *see* William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, *Federal Civil Procedure Before Trial* § 14:144 (1999).

A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. In considering a motion for summary judgment, the court draws all justifiable inferences, "including questions of credibility and of the weight to be accorded particular evidence," in the light most favorable to the nonmoving party. *Masson v. New Yorker Magazine*, 501 U.S. 496, 520, 111 S.Ct. 2419, 2434, 115 L.Ed.2d 447 (1991). To withstand Defendants' Motion, Plaintiffs must "present evidence from which a jury might return a verdict in his favor. If [they] do so, there is a genuine issue of fact that requires a trial." *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514.

**B. Summary Judgment In A Defamation Action**

 "When determining whether a genuine factual issue as to actual malice exists in a [defamation] suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times* [*Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964) ]." *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513; *Dodds v. American Broadcasting Co.*, 145 F.3d 1053, 1060 (9th Cir.1998), *cert. denied*, 525 U.S. 1102, 119 S.Ct. 866, 142 L.Ed.2d 769 (1999). The parties have stipulated that D.A.R.E. and Levant are both "public figures" for defamation purposes. [Declaration of Elizabeth McNamara ("McNamara Decl."), Ex. AA (Joint Stipulation).] Under the standard established by the Supreme Court in *New York Times*, public figures cannot recover for defamation unless they show that a reasonable jury could find "by clear and convincing evidence that the defendant[s] published the defamatory statement[s] with actual malice, i.e., with 'knowledge that [they] were false or with reckless disregard for whether [they] were false or not.'" *Masson*, 501 U.S. at 510, 111 S.Ct. at 2429 (quoting *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 726); *Anderson*, 477 U.S. at 255–56, 106 S.Ct. at 2513–14; *Dodds*, 145 F.3d at 1059. Whether the evidence in the record supports a finding of actual malice is a question of law. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562 (1989).

 "Reckless disregard" (1) encompasses a defendant's " 'high degree of awareness of … probable falsity,' " or " 'serious doubts as to the truth' " of the publication, *Eastwood v. National Enquirer*, 123 F.3d 1249, 1250–51 (9th Cir.1997) (quoting *Harte–Hanks*, 491 U.S. at 666–67, 109 S.Ct. at 2685), or (2) applies if the defendant had " 'obvious reasons to doubt the veracity' " of its statements, but engaged in " 'purposeful avoidance of the truth.' " *Eastwood*, 123 F.3d at 1251 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Harte–Hanks*, 491 U.S. at 692, 109 S.Ct. at 2698). Direct evidence to this

effect is extremely difficult to obtain, so actual malice may be proven by circumstantial evidence, given the totality of the circumstances surrounding the publication. *Kaelin v. Globe Communications Corp.,* 162 F.3d 1036, 1040 (9th Cir.1998); *Eastwood,* 123 F.3d at 1253.

## C. Summary Judgment As A "Favored Remedy"

Citing to *Reader's Digest Ass'n, Inc. v. Superior Court,* 37 Cal.3d 244, 252, 208 Cal.Rptr. 137, 141, 690 P.2d 610 (1984), Defendants argue that summary judgment is a "favored remedy" in defamation cases because of courts' concern with preserving the constitutional right of free expression. [Defs.' Mot.Summ.J. at 14 n. 9.] Plaintiffs retort that Defendants thus "mischaracterize not only the standard to be applied when deciding a motion for summary judgment but also the courts' view of summary judgment as a " 'favored remedy in defamation cases.' " [Pls.' Opp'n at 15–16.]

California's courts of appeal have stated that " '[s]ummary judgment is a favored remedy in defamation and invasion-of-privacy cases due to the chilling effect of protracted litigation on First Amendment rights.' " *Alszeh v. Home Box Office,* 67 Cal.App.4th 1456, 1460, 80 Cal.Rptr.2d 16, 17 (1998) (quoting *Couch v. San Juan Unified School Dist.,* 33 Cal.App.4th 1491, 1498, 39 Cal.Rptr.2d 848, 853 (1995)); *see also Jensen v. Hewlett–Packard Co.,* 14 Cal.App.4th 958, 964, 18 Cal.Rptr.2d 83, 85 (1993) (quoting *Good Government Group of Seal Beach, Inc. v. Superior Court,* 22 Cal.3d 672, 685, 150 Cal.Rptr. 258, 264, 586 P.2d 572 (1978)).

■ The California Supreme Court found in *Reader's Digest,* however, that "[i]t is pointless to declare in the abstract that summary judgment is a favored or disfavored remedy." *Reader's Digest,* 37 Cal.3d at 251, 208 Cal.Rptr at 141, 690 P.2d 610. This observation is consistent with the appellate courts' concerns about the chilling effect of protracted defamation litigation. With such concerns in mind, courts may find "no triable issues unless it appears that actual malice may be proved at trial by clear and convincing evidence— i.e., evidence sufficient to permit a trier of fact to find for the plaintiff and for an appellate court to determine that the resulting judgment 'does not constitute a forbidden intrusion on the field of free expression.' *Bose Corp. v. Consumers Union,* 466 U.S. 485, 498, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984). To this extent, therefore, summary judgment remains a 'favored' remedy in defamation cases involving the issue of 'actual malice' under the *New York Times* standard." *Reader's Digest,* 37 Cal.3d at 252, 208 Cal. Rptr. at 141, 690 P.2d 610.

## IV. GLASS'S KNOWLEDGE IS NOT IMPUTED TO *ROLLING STONE*

The Court first must resolve the dispute over Glass's legal relationship with *Rolling Stone.* If Glass was a *Rolling Stone* employee when he wrote "Truth and D.A.R.E.," the magazine may be liable under *respondeat superior* principles for any damage caused by falsehoods in the article. *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 254, 95 S.Ct. 465, 471, 42 L.Ed.2d 419 (1974); *Hunt v. Liberty Lobby,* 720 F.2d 631, 648 (11th Cir.1983) Because Glass admits his fabrications, if the Court determines he is an employee of *Rolling Stone,* his knowledge of falsehoods in "Truth and D.A.R.E." will be imputed to Defendants.

■ Under California law, *see Hunt,* 720 F.2d at 649 (applying state law to determine vicarious liability), the question whether Glass was an employee, as Plaintiffs contend, [Pls.' Opp'n. at 17–21], or an independent contractor, as Defendants assert, [Defs.' Mot.Summ.J. at 25–27; Reply at 9–12], "is ordinarily a question of fact but if from all the facts only one inference can be drawn it is a question of law." *Brose v. Union–Tribune Publishing Co.,* 183 Cal.App.3d 1079, 1081, 228 Cal.Rptr. 620, 621 (1986); *Germann v. Workers' Compensation Appeals Bd.,* 123 Cal.

App.3d 776, 783, 176 Cal.Rptr. 868, 871 (1981).

 While the Court must consider various factors in resolving this question, "one of the best tests," and indeed, "the decisive test" is the "right of control over the mode and manner in which the work is done." *Brose,* 183 Cal.App.3d at 1082, 228 Cal. Rptr. at 622; *Germann,* 123 Cal.App.3d at 783, 176 Cal.Rptr. at 871. It is "not a question of interference, or noninterference, not a question of whether there have been suggestions, or even orders, as to the conduct of the work; but a question of the right to act, as distinguished from the act itself or failure to act." *Brose,* 183 Cal. App.3d at 1082, 228 Cal.Rptr. at 622 (quoting *Hillen v. Industrial Acc. Com.,* 199 Cal. 577, 581–82, 250 P. 570 (1926)).

The Court also considers the employer's right to terminate the employee's services, and the employee's right to quit when he wishes, without either party incurring liability for failure to complete the job; a distinct occupation or business on the part of the person performing the service; the nature of the occupation, i.e., the special skills or training necessary to render the service; who supplies the instrumentalities, tools, and place of work; the length of time required to render the service; the method of payment; and the parties' belief as to the arrangement they have created. *Brose,* 183 Cal.App.3d at 1085–86, 228 Cal. Rptr. at 624–25; *Germann,* 123 Cal.App.3d at 783, 176 Cal.Rptr. at 871.

## A. *Rolling Stone* Did Not Exercise Control Over Glass

 *Rolling Stone* did not exercise sufficient control over Glass to permit the Court to characterize him as an employee. "If control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent contractor relationship is established."

*Tieberg v. Unemployment Insurance Appeals Board,* 2 Cal.3d 943, 946, 88 Cal. Rptr. 175, 177, 471 P.2d 975 (1970). Glass entered into a standard "contributor's agreement," the terms of which were altered to provide him with a steady stream of income, [Affidavit of Robert Love [1] ("Love Affidavit") at 6–7], and *Rolling Stone* did not control "how, when, or where Glass did his reporting and writing on any article he was doing for the magazine." [Love Affidavit at 8.] Glass's consultations with *Rolling Stone* during the writing process were cursory, and the reporting and drafting of the story were "primarily the journalist's responsibility." [Love Affidavit at 8.]

The editorial process commenced *after* Glass submitted his draft of the article to *Rolling Stone.* [Love Affidavit at 8.] The editing and cite-checking *Rolling Stone* performed on the article constituted control only as to the result of the work, and had a negligible impact on the means of accomplishing the work, i.e., through Glass's own research, writing, and revisions. This case is distinguishable from *Tieberg,* where writers working for a television producer consulted regularly and intimately with editors and producers while preparing teleplays adapted from initial oral or written presentations of story ideas. *Tieberg,* 2 Cal.3d at 948, 952, 88 Cal.Rptr. at 178, 181, 471 P.2d 975.

The *Tieberg* court also noted that, notwithstanding its finding that the writers were employees, absent independent evidence of control over the means of accomplishing the work, the fact that the writers were engaged in a distinct occupation, that their work involved skill, that they did not work on the producers' premises, and that they were each employed to write a particular work "would appear to suggest an independent contractor relationship." *Tieberg,* 2 Cal.3d at 953, 88 Cal.Rptr. at 182,

---

1. On April 14, 2000, Plaintiffs filed Evidentiary Objections to the affidavit of Robert Love, and the declarations of Matthew Morse, Gina Zucker and Perry van der Meer. These objections should have been included with Plaintiffs' Opposition, filed April 3, 2000. These objections were filed eleven days later, and are untimely. Accordingly, the Court does not consider them.

471 P.2d 975. Here, by contrast, *Rolling Stone* exercised little or no independent control over Glass's work; accordingly, these additional factors further demonstrate a lack of control by *Rolling Stone* and the existence of an independent contractor relationship between the magazine and the writer. [*See* Defs.' Mot.Summ.J. at 26.]

## B. Other Factors Showing An Independent Contractor Relationship

The respective beliefs of the parties and the method of payment also guide courts in their characterization of a business relationship. *Tieberg*, 2 Cal.3d at 953, 954, 88 Cal.Rptr at 182, 183, 471 P.2d 975; *Germann*, 123 Cal.App.3d at 783, 176 Cal. Rptr. at 871. Here, Glass was not salaried, but rather was paid for each article; moreover, neither he nor Defendants perceived their relationship to be between employer and employee. These factors thus affirm his status as an independent contractor.

Glass declared that *Rolling Stone* had editorial authority and control over the D.A.R.E. article, and that he was paid on a monthly basis for his services, but never characterized himself as an employee. [McNamara Decl., Ex. X at 3 (Glass Declaration).] Likewise, Love believed that "[a]t no point" did Glass "become an employee of the magazine." [Love. Decl. at 7.] Throughout the time he worked on "Truth and D.A.R.E.," Glass retained his staff position as an employee of *The New Republic.* [Love Affidavit at 7; McNamara Decl., Ex. X (Glass Declaration) at 1.]

Under his September 1, 1997 contract with *Rolling Stone,* Glass agreed to write six articles of 4,000 words apiece, for which he would be paid $7,000 per article, plus an additional $2,500 for each article actually published. [Love Affidavit at 7.] *Rolling Stone* agreed to divide the $7,000 payment for the six article commitment over a twelve month period, resulting in a $3,500 monthly stipend "that allows freelance contributors to have a more even flow of cash." [Love Affidavit at 7.] Were Glass unable to complete his obligation within the term of the contract, he would be "bound to complete the remaining articles within six months, without additional compensation." [Love Affidavit at 7.]

This contract explicitly limited Glass's relationship with *Rolling Stone* to a freelance arrangement whereby Glass was obligated to produce a certain number of articles within a predetermined time frame. Glass's $7,000 payment clearly was predicated upon finishing individual projects for the magazine, and the limited term of the contract reflects that no ongoing relationship was established.

*Rolling Stone* reported Glass's earnings to the Internal Revenue Service on Form 1099 (used for independent contractors), [Love Affidavit, Ex. N (IRS Form 1099)], and neither paid nor withheld taxes from payments made to Glass, nor bestowed upon him bonuses or fringe benefits. [Defs.' Mot.Summ.J. at 26; Love Affidavit at 7.]

Accordingly, Stephen Glass's knowledge of his own fabrications cannot be attributed to *Rolling Stone* because an employer-employee relationship did not exist between him and the magazine. Glass was an independent contractor in the eyes of the law. Defendants are not vicariously liable for his actions, and therefore Plaintiffs must prove that Defendants acted with actual malice by clear and convincing evidence.

## V. PLAINTIFFS FAIL TO SHOW ACTUAL MALICE

### A. The Evidence Of Defendants' Alleged Actual Malice Is Insufficient As A Matter Of Law

■ Defendants argue that *Rolling Stone* reasonably relied on Glass and the *New Republic* article on D.A.R.E. [Defs.' Mot.Summ.J. at 15–18; Reply at 3.] Plaintiffs' countervailing assertion that "*Rolling Stone* failed to use readily available means to verify the accuracy of Glass's reporting when the magazine relied solely on Glass

and the 1997 [*New Republic*] Article," is unpersuasive. [Pls.' Opp'n at 24.] Defendants' actions bear little resemblance to behavior which the Ninth Circuit has deemed to be "reckless disregard of the truth." For example, in *Kaelin*, a tabloid editor conceded he believed readers might misconstrue the headline "Kato Did It" to link O.J. Simpson's house guest Kato Kaelin to the murders of Ron Goldman and Nicole Brown; the tabloid ran the headline having no reason to associate Kaelin with the crime, and the editor's testimony permitted an inference that the tabloid had a pecuniary motive for doing so. *Kaelin*, 162 F.3d at 1042.

### Glass's Reputation and Prior Publications

*Rolling Stone* published "Truth and D.A.R.E." several months before Glass's wrongdoing was exposed. At that time, Defendants had no reason to question Glass's veracity or the authenticity of his sources. Robert Love testified that he made inquiries about Glass, which unearthed "absolutely nothing negative about him"; neither did Love "hear anything to give [him] the slightest concern about [Glass's] reporting skills." [Love Affidavit at 3.] Love understood Glass's prior affiliation with *The New Republic* to be "one of the best calling cards a young writer can have," and believed that *The New Republic*'s editors had "significant trust and pride" in a writer it featured as prominently as Glass. [Love Affidavit at 3; *see also* McNamara Decl., Ex. FF (Transcript of Glass Deposition) at 14 (Glass's work published in *USA Today* and *The Wall Street Journal*).] As part of *Rolling Stone*'s initial agreement with Glass, concluded in May, 1997,[2] Glass explicitly represented that every article he would submit to the magazine would not be libelous, or infringe on the rights of any other persons or entities. [Love Affidavit at 6.] In October 1997, several months prior to publishing "Truth and D.A.R.E.," *Rolling Stone* pub-

lished Glass's article critical of the *U.S. News and World Report*'s college ranking issue without incident. [Love Affidavit at 5.]

When Glass submitted "Truth and D.A.R.E." for editorial review, Love did not become concerned about Glass's behavior or the quality of his reporting during several revisions of the draft of the article. [Love Affidavit at 9.] In his seventeen years at *Rolling Stone*, Love could not recall another reporter who fabricated quotes and information in an article destined for publication; given Glass's good journalistic reputation, *Rolling Stone*'s previous experience publishing his college rankings article, and "the consistent and accurate corroboration that we found for information in ['Truth and D.A.R.E.,']" Love had no basis for suspecting that Glass wholly concocted portions of the article. [Love Affidavit at 13.]

Defendants were entitled to "rely on the investigation of the matter" previously conducted by *The New Republic*, as well as its "sterling reputation for accuracy," in evaluating whether to publish "Truth and D.A.R.E." *Masson v. New Yorker*, 960 F.2d 896, 902 (9th Cir.1992), on remand from 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Under the law, Defendants could not publish the article if they harbored serious doubts about its veracity, and they have adequately demonstrated that they had no legitimate reason to entertain any such concerns.

### Levant's Letter to *The New Republic*

█ Plaintiffs argue that Defendants acted in purposeful avoidance of the truth because they were aware that Levant wrote to *The New Republic* after it published "Don't You D.A.R.E.," "alerting [Defendants] and *The New Republic*'s readership to 'the outrageous false assertions' in the 1997 TNR Article." [Pls.' Opp'n at 24–25; Guttman Decl., Ex. G (*The New Republic* correspondence, Au-

---

**2.** This agreement was later modified, but Glass was nonetheless bound by the same

ethical guidelines. [*See* Love Affidavit at 6–7.]

gust 4, 1997 Issue).] Although Glass purportedly told Zucker about the letter and provided *Rolling Stone* with a copy, Plaintiffs allege Defendants never contacted D.A.R.E. or Levant before publishing "Truth and D.A.R.E." [Pls.' Opp'n at 25.]

The record belies Plaintiffs' assertions. Zucker testified that Glass informed her about Levant's letter, but she understood that *"The New Republic* had stood by the ["Don't You D.A.R.E."] article and that D.A.R.E. had 'backed down' after *The New Republic* responded to the letter." [Declaration of Gina Zucker ("Zucker Decl.") at 11.] Furthermore, Zucker spoke with two people at D.A.R.E., Ralph Lochridge and Mia Stryke, whom Zucker found to be "generally cooperative and provided me with the information I needed." [Zucker Decl. at 18.]

Levant's letter made Defendants aware that D.A.R.E. questioned Glass's credibility, but, standing alone, did not provide "obvious reasons" to doubt his veracity, especially because Levant was the president of the organization Glass criticized in his article. Under the circumstances, Levant's response was hardly surprising. The letter's unconfirmed, albeit serious, allegations that Glass's earlier article contained fabrications, were not sufficient to trigger a "high degree of awareness" of the "probable falsity" of his statements, or to raise "serious doubts" about the truth of an article. *Eastwood,* 123 F.3d at 1249.

In *Eastwood,* the *National Enquirer's* interview with Clint Eastwood was purportedly conducted by a freelance writer who could not verify when or where it took place, and whose reputation was shady at best. While the Ninth Circuit found that the *Enquirer* adopted a dubious "see-no-evil, hear-no-evil tack" in failing to investigate further, it held nonetheless that the *Enquirer* did not act with reckless disregard for whether the meeting actually took place. *Eastwood,* 123 F.3d at 1254; *see also Masson,* 960 F.2d at 902 (publisher Knopf's knowledge that plaintiff's attorney contacted *The New Yorker,* which first published allegedly libelous material at is-

sue, weighed in Knopf's favor; Knopf was entitled to rely on *The New Yorker's* good reputation and previous investigation of the matter). Thus, Levant's letter did not cast sufficiently grave doubt on Glass's reliability to make Defendants' subsequent publication of "Truth and D.A.R.E." legally malicious.

### Defendants' Fact–Checking Process

A journalist does not act with reckless disregard for the truth in relying on a source whose trustworthiness is unknown as long as some attempt is made to verify the journalist's story. *Dodds,* 145 F.3d at 1062 (citing *St. Amant,* 390 U.S. at 732–33, 88 S.Ct. at 1326–27). Defendants surpassed this obligation; *Rolling Stone* "Truth and D.A.R.E." to rigorous fact-checking, a task assigned to Gina Zucker, and to which she devoted approximately five full days of work. [Love Affidavit at 10; Zucker Decl. at 4; Defs.' Mot.Summ.J. at 19–20.] Her efforts dispel any suspicion that Defendants "purposefully avoided the truth" when they published "Truth and D.A.R.E." [Pls.' Opp'n at 24.]

Defendants cite to multiple sources they contend lent credence to Glass's article. These include minutes obtained from a 1993 D.A.R.E. Policy Advisory Board describing D.A.R.E.'s "efforts to prevent a second presentation of the RTI study through litigation," and a letter from the Board to local D.A.R.E. chapters "expressing D.A.R.E.'s concerns about research critical of the D.A.R.E. program and the need for 'ammunition' to battle this research." [Defs.' Mot.Summ.J. at 19, 20.] In her declaration, Zucker provides detailed explanations for why she considered accurate each of the statements alleged by Plaintiffs to be libelous, and what information she relied on in arriving at each determination. [Zucker Decl. at 24–36.]

### Documentary Sources

Glass was cooperative during the fact-checking process, and provided Ms. Zucker with an annotated draft of his article, copies of his documentary source materi-

als, telephone numbers for some of his individual sources, and many of his personal interview notes. Zucker also consulted many print articles related to D.A.R.E. [Zucker Decl. at 6–7, 8–9.] Zucker further reported finding support for Glass's article in issues of *Reason* magazine, *Sociological Focus,* and *USA Today,* and reviewed Levant's recently-published book, *Keeping Kids Drug–Free,* to corroborate Glass's quotations and his description of the D.A.R.E. program. [Zucker Decl. at 12–14.]

Zucker noted that "most of the information in the Article," particularly the contentions that certain studies concluded that D.A.R.E. was ineffective, and that D.A.R.E. tried to suppress the publication of the RTI study by the National Institute of Justice, "had been published in a number of publications." [Zucker Decl. at 10.] The article "closely tracked" Glass's "Don't You D.A.R.E." article from *The New Republic,* which itself incorporated similar information from a D.A.R.E.-related article in *Reason* magazine. [Zucker Decl. at 10.]

Defendants' reliance on the accuracy of information contained in previously published material, as well as accepting Glass's own assurances that the *New Republic* Article "had been thoroughly fact-checked before publication and, after D.A.R.E. had complained [in Levant's letter to the editor], it had been reviewed with a fine tooth comb," [Zucker Decl. at 11], is critical in light of the Supreme Court's admonition that mere negligence "does not suffice" to support a showing of actual malice. *Masson,* 501 U.S. at 510, 111 S.Ct. at 2429.

Although Plaintiffs take issue with Zucker's failure to contact *The New Republic* to ascertain the extent of its own fact-checking efforts, [Pls.' Opp'n at 11–12], the failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard for the truth. *Harte–Hanks,* 491 U.S. at 687, 109 S.Ct. at 2696 (citing *St. Amant,* 390 U.S. at 731, 733, 88

S.Ct. at 1325, 1326; *Hunt,* 720 F.2d at 642; *Schultz v. Newsweek, Inc.,* 668 F.2d 911, 918 (6th Cir.1982)); *Dodds,* 145 F.3d at 1063. Even if Defendants relied too heavily on the veracity of Glass's previously published work—and it appears they did not, given that "no corrections or retractions" were made to the *New Republic* article, [Zucker Decl. at 11]—this would rise only to the level of negligence, and not reckless disregard of the truth or falsity of "Truth and D.A.R.E." *Dodds,* 145 F.3d at 1063.

**Individual Sources**

Zucker spoke to many of Glass's individual contacts, including Professor Richard Moran of Mount Holyoke College, who "strongly affirmed" the contentions made and quotes attributed to him in the article. Professor Earl Wysong, one of the authors of the *Sociological Focus* article upon which Glass relied in crafting "Truth and D.A.R.E.," also confirmed the accuracy of the material. [Zucker Decl. at 15–16.]

Zucker also spoke with Betsy Paul about anti-D.A.R.E. parent meetings reported on "Dateline: NBC" which D.A.R.E. alleged were staged. [Zucker Decl. at 16.] Plaintiffs contend Paul informed Zucker that Glass fabricated "several statements in the 1997 TNR article that were attributed to her and that she felt she was 'inaccurately portrayed.'" [Pls.' Opp'n at 11.] Defendants point out, however, that Paul took issue only with the phrasing of the quote, and stood behind its substance. [Reply at 5–6.] Paul stated at her deposition that Glass's quotations made her "sound hysterical, which [she] tried not to be. Not professional like [she] wanted to be." [McNamara Decl., Ex. MM at 60 (Deposition of Elizabeth Paul).] Nonetheless, she affirmed that "the allegations [made by D.A.R.E. that the parent meetings referred to in Glass's *New Republic* article were staged] are ludicrous and ridiculous." [McNamara Decl., Ex. MM at 60 (Deposition of Elizabeth Paul).]

Zucker contacted individuals at D.A.R.E., including Dr. Herbert Kleber,

Ralph Lochridge and Mia Stryke. [Zucker Decl. at 17–18; Reply at 8.] This contradicts Plaintiffs' assertion that neither Zucker nor her colleagues at *Rolling Stone* "ever contacted Levant or anyone from D.A.R.E." prior to publishing Glass's article. [Pls.' Opp'n at 25.] [3]

**Confidential Sources**

Finally, Zucker attempted to corroborate information obtained from Glass's confidential sources. [Defs.' Mot.Summ.J. at 22–23.] She relied heavily on Glass's own interview notes, and his assurances that he spoke by telephone to sources who wished to remain anonymous in order to verify the statements. [Zucker Decl. at 20–22.] Nothing during the checking of the confidential source material gave her any "pause or concern." [Zucker Decl. at 23.]

Plaintiffs also suggest that Defendants acted with reckless disregard of the truth by failing to contact, or instructing Zucker to contact, Glass's confidential sources. [Pls.' Opp'n at 24.] This argument also fails. Defendants explain that relying on an author's representations about sensitive and anonymous sources is *de rigeur* in the publishing industry as a measure of respect for an author's resources and the privacy of persons volunteering sensitive information. [Zucker Decl. at 19–20.] Industry practice aside, if a defendant has not acted with reckless disregard of the truth by failing to contact the subject of a planned publication, then *a fortiori*, a defendant has not acted improperly by fail-

ing to contact third parties or sources of information contained in the publication. *See Coliniatis*, 965 F.Supp. at 518; *Secord*, 747 F.Supp. at 788, *Davis*, 654 F.Supp. at 657.

**_Rolling Stone_'s Pre–Publication Efforts Were Sufficient**

Defendants did not act in reckless disregard of the truth, as their pre-publication efforts to verify the information in "Truth and D.A.R.E." attest. Any imperfections in these efforts were incidental and, in light of prevailing precedent, do not provide clear and convincing evidence such that Plaintiffs could prevail at trial. In *Dodds v. American Broadcasting Co.,* the Ninth Circuit affirmed summary judgment for ABC in a defamation case, even where the network's correspondent "could have done a more thorough and responsible job in general in determining the facts before presenting its report" on "Prime Time Live," which was critical of a superior court judge. *Dodds,* 145 F.3d at 1062, 1063. Although the plaintiff may have raised a factual issue regarding the network's negligence in failing to investigate more rigorously its story and its sources, such negligence was insufficient as a matter of law to support a finding of malice by clear and convincing evidence. *Dodds,* 145 F.3d at 1063.

Although much of Glass's fabricated material found its way into the published article, "there is no actual malice where journalists unknowingly mislead the pub-

3. Plaintiffs' suggestion that Defendants' failure to contact D.A.R.E. or Levant before publishing Glass's article evidences actual malice is both belied by the evidence and legally misguided. [Defs.' Opp'n at 25.] Defendants were not required to contact the subjects of the article before publication. In *Eastwood,* the Ninth Circuit found the *National Enquirer* was not required to contact Clint Eastwood before publishing an "exclusive" interview with him. *Eastwood,* 123 F.3d at 1254 n. 10. Other federal courts have reached similar conclusions. *See, e.g., Coliniatis v. Dimas,* 965 F.Supp. 511, 518 (S.D.N.Y.1997) (newspaper did not act with actual malice where it failed to contact plaintiff until one day before publication of article describing his involve-

ment in kickback arrangement, or to broach subject matter in interview conducted four days before publication); *Secord v. Cockburn,* 747 F.Supp. 779, 789 (D.D.C.1990) (author of book regarding Contra and drug activities in Nicaragua not required to apprise retired Major General William Secord of specific information gleaned from interview with him that she intended to print; such a requirement would degrade author's "quintessential" exercise of her First Amendment rights); *Davis v. Costa–Gavras,* 654 F.Supp. 653, 657 (S.D.N.Y. 1987) (film-maker not required to consult with plaintiff before making "docu-drama" where plaintiff contended the purpose of the work was to show he was responsible for death of American national residing in Chile).

lic." *Eastwood,* 123 F.3d at 1256. "Even an extreme departure from accepted professional standards of journalism will not suffice to establish actual malice." *Newton v. National Broadcasting Co., Inc.,* 930 F.2d 662, 668 (9th Cir.1990).

*Rolling Stone* 's readership may have been misled, but Glass's deposition testimony makes clear the ingenuity of his deception, and the difficulty *Rolling Stone* or its fact-checker Ms. Zucker would have encountered exposing it. Glass himself is a former fact-checker, [Zucker Decl. at 5], which enabled him to conceal the falsehoods in his story, and also afforded him added credibility when working with Zucker to "verify" quotes from anonymous sources. Glass acknowledged that his goal was to "fool" *Rolling Stone* 's fact-checker, and that his efforts were "extremely effective." [McNamara Decl., Ex FF (Glass Deposition) at 178.]

Glass supplied Ms. Zucker with falsified notes, which he created for the sole purpose of responding to her demands for support for certain elements of the article. [McNamara Decl., Ex. FF (Glass Deposition) at 175–76.] He intentionally included grammatical and spelling errors to give his falsified notes the appearance of being created during an actual interview. [McNamara Decl., Ex. FF (Glass Deposition) at 177.] Glass falsely represented that he spoke to a source who requested small changes to a statement to impart an air of accuracy to the quotations. [McNamara Decl., Ex. FF (Glass Deposition) at 192.] He described his technique as using a string of truthful, and indeed, assiduously corroborated, statements, which were embellished with "a little twist at the end, a little capper that was untruthful," allowing the deception "to get past the fact checkers" more easily. [McNamara Decl., Ex. FF (Glass Deposition) at 236–37.] This suggests that Glass's falsehoods would have found their way into "Truth and D.A.R.E." despite Defendants' best efforts to assure the accuracy of the article at a time when they had no reason to question his journalistic integrity.

In light of Glass's then-unblemished reputation, the fact that much of "Truth and D.A.R.E." was in essence pre-published by *The New Republic,* and Glass's elaborate ruse to frustrate her verification efforts, none of Zucker's actions even begin to suggest that Defendants deliberately suppressed any doubts about the article. As their fact-checking efforts demonstrate, Defendants did not publish "Truth and D.A.R.E." with reckless disregard of its truth or falsity; to the contrary, they devoted the necessary time and effort to confirm Glass's sources and information. That Glass deceived Defendants despite this process does not support a finding that the latter recklessly disregarded the truth.

**B. Defendants' Motivation For Publishing "Truth and D.A.R.E." Is Irrelevant**

Plaintiffs misconstrue the definition of "actual malice," which the Supreme Court has emphasized is "a term of art, created to provide a convenient shorthand expression for the standard of liability that must be established" for public figures to recover in libel cases. *Cantrell,* 419 U.S. at 251, 95 S.Ct. at 469. Plaintiffs argue that "[t]he motive to write a story with a particular slant is circumstantial evidence which, combined with other evidence, may amount to malice." [Pls.' Opp'n at 26.] Plaintiffs are incorrect. Plaintiffs refer to *Rolling Stone* 's "agenda of advancing the cause of drug legalization," and list several *Rolling Stone* articles critical of the "War on Drugs," but *Rolling Stone* 's editorial slant is not at issue here. [Pls.' Opp'n at 26.]

The Supreme Court has repeatedly held that in defamation cases, the phrase "actual malice" "has nothing to do with bad motive or ill will." *Harte–Hanks,* 491 U.S. at 667 n. 7, 109 S.Ct. at 2685 n. 7; *see also Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 52 n. 18, 91 S.Ct. 1811, 1824 n. 18, 29 L.Ed.2d 296 (1971); *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 88 S.Ct. 197,

19 L.Ed.2d 248 (1967) (per curiam); *Henry v. Collins*, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965) (per curiam); *Welsh v. City and County of San Francisco*, 1995 WL 714350 *6 (N.D.Cal.). Defendants correctly assert that even if *Rolling Stone* were biased against D.A.R.E., this would not show "actual malice." [Defs.' Mot. Summ.J. at 25.] Plaintiffs' argument thus lends no support to their allegation that Defendants published Glass's article with reckless disregard for the truth.

### C. The Contents of "Truth and D.A.R.E." Were Not "Inherently Defamatory and Improbable"

■ Plaintiff contends that the statements in Glass's article describing criminal conduct by D.A.R.E. supporters are "inherently defamatory and improbable, requiring a rigorous inspection which *Rolling Stone* failed to conduct." [Pls.' Opp'n at 22.] Plaintiffs characterize those parts of "Truth and D.A.R.E." that accuse D.A.R.E. and Levant of engaging in "criminal conduct and strong arm tactics, such as slashing tires, threatening children and making harassing phone calls" as referring to "unthinkable (and certainly unlikely) conduct for an organization whose mission is to educate children to resist violence and drugs." [Pls.' Opp'n at 23.]

The mere fact that D.A.R.E. is an anti-drug organization affiliated with the Los Angeles Police Department does not establish that accusations of wrongful or even criminal conduct by its supporters are "inherently improbable" and certainly does not make such accusations "inherently defamatory." The California Supreme Court, applying *St. Amant* in a defamation case, found a prisoner's charges that "he had been coerced, struck, and otherwise improperly induced to testify" by a police officer were "not inherently improbable." *McCoy v. Hearst Corp.*, 42 Cal.3d 835, 864, 231 Cal.Rptr. 518, 537, 727 P.2d 711 (1986).

*St. Amant*'s admonition that a publisher is not likely to prevail when the allegedly libelous statements are "so inherently improbable that only a reckless man would have put them into circulation" merely informed the Court's more general discussion of the reckless disregard standard. It served as one example of an instance where a defendant in a defamation action brought by a public official cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326; *see McCoy*, 42 Cal.3d at 863–64, 231 Cal.Rptr. at 537–38, 727 P.2d 711. Defendants' good faith is not impugned merely by Glass's allegations of unlawful conduct by D.A.R.E. supporters, because such conduct is not inherently improbable.

### VI. THE EDITOR'S NOTES WERE NOT DEFAMATORY

■ Plaintiffs argue that Defendants' "refusal to retract defamatory statements" contained in "Truth and D.A.R.E.," even after Glass admitted his wrongdoing, is evidence of actual malice. [Pls.' Opp'n at 27.]

In other words, Plaintiffs contend Defendants committed libel by omission: they are liable to Plaintiffs because the two Editor's Notes only acknowledged the falsity of three of the eight allegedly defamatory statements. To the extent that Plaintiffs' defamation case is built upon a foundation of omissions in the Editor's Notes, it collapses.

The first Editor's Note stated that Glass's accuracy had come into question, and that *Rolling Stone* was re fact-checking his work, but had found nothing to contradict the essence of "Truth and D.A.R.E." [Defs.' Mot.Summ.J. at 28; Guttman Decl., Ex. X (*Rolling Stone* Correspondence, Love Letters & Advice, June 9–23 Issue).] The second Editor's Note also reiterated the accuracy of the gist or core of Glass's article, but specifically acknowledged that some quotes and incidents were found to be fabrications. [Defs.' Mot.Summ.J. at 29; Guttman Decl., Ex. Z (*Rolling Stone* Correspondence, Love Letters & Advice, August 9, 1998 Issue).] Specifically, "the incidents of

threats involving Illinois and California college professors as well as a New York graduate student, were invented." [Guttman Decl., Ex. Z (*Rolling Stone* Correspondence, Love Letters & Advice, August 9, 1998 Issue).] [Defs.' Mot.Summ.J. at 28; Second Amended Complaint at 9.] Neither Note republished or referred to any of the statements Plaintiffs allege are libelous.

There is no authority to support Plaintiffs' argument that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication. *See McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C.Cir.1996) (noting lack of authority supporting liability for failure to retract). If a publisher's wholesale refusal to retract in *McFarlane* did not constitute actual malice, it follows that a publisher's retraction which does not satisfy the aggrieved party surely is not actionable as defamatory. *See McFarlane*, 91 F.3d at 1515.

Plaintiffs' authorities are unpersuasive. *Golden Bear Distributing Systems of Texas v. Chase Revel, Inc.* merely cites the Restatement of Torts for the proposition that under certain circumstances, evidence of a publisher's refusal to retract a statement after it has been demonstrated to be both false and defamatory might be relevant in showing recklessness at the time the statement was published. *Golden Bear Distributing Systems of Texas*, 708 F.2d 944, 950 (5th Cir.1983), abrogation recognized on other grounds, *Hiller v. Manufacturers Product Research Group of North America, Inc.*, 59 F.3d 1514 (5th Cir.1995). *Golden Bear* is distinguishable because the publisher admitted he had serious doubts about whether the plaintiff made false promises to investors, and refused to print a retraction even after Golden Bear contacted the magazine, "offering to prove that it was innocent of any wrongdoing." *Golden Bear*, 708 F.2d at 950.

*Church of Scientology v. Dell Publishing* merely noted that the Supreme Court left open the question in *New York Times* whether a failure to retract could ever constitute evidence of actual malice in the defamation context. The court then denied summary judgment, finding that "prepublication denials and demands for retraction are not decisive either way." *Church of Scientology*, 362 F.Supp. 767, 770 (N.D.Cal.1973).

Finally, and most importantly, the California Civil Code provides that defamatory language "not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof." Cal.Civ. Code § 45a. The Editor's Notes are not libelous on their face; they require the extrinsic or explanatory matter of the original article. Under section 45a, therefore, the Editor's Notes are only actionable if Plaintiffs plead special damages. Plaintiffs have stipulated, however, that they "will not seek special damages and will not present any special damage theories in substance or conclusion." [Declaration of Elizabeth McNamara in Support of Defendants' Reply, Exs. A (March 29, 2000 letter from Elizabeth McNamara), B (March 30, 2000 letter from Ronald E. Guttman).] Accordingly, Plaintiffs cannot recover on these statements as alleged "republications" of Defendants' libel.

## VII. SUBSTANTIAL TRUTH OF CERTAIN STATEMENTS

Defendants argue that the statements which "accuse plaintiffs of taking steps to 'silence' or 'play hardball' with critics, 'suppress scientific research' or try to 'scare out science,'" are not actionable as a matter of law because they are "substantially true." [Defs.' Mot.Summ.J. at 30–31.] Specifically, Defendants assert that D.A.R.E. attempted to silence researchers at the Research Triangle Institute, editors at the American Journal of Public Health, and producers at "Dateline: NBC." [Defs.' Mot.Summ.J. at 31–32.]

"Substantial truth" is a defense to defamation under California law. *Masson*, 501 U.S. at 516–17, 111 S.Ct. at 2432–33.

"Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge can be justified.'" *Masson*, 501 U.S. at 517, 111 S.Ct. at 2433 (quoting *Heuer v. Kee*, 15 Cal. App.2d 710, 714, 59 P.2d 1063, 1064 (1936)); *see also Ferlauto v. Hamsher*, 74 Cal.App.4th 1394, 1404, 88 Cal.Rptr.2d 843, 851 (1999).

■■■ Plaintiffs insist that substantial truth is a jury question. The cases upon which they rely, however, only find a triable issue of fact when substantial truth is not evident to the court. *See, e.g., Maheu v. Hughes Tool Co.*, 569 F.2d 459, 465 (9th Cir.1977) ("Applying [the substantial truth] standard, after a careful review of the record, we conclude that there were sufficient disputed facts to require the case to go to the jury"); *Shumate v. Johnson Publishing Co.*, 139 Cal.App.2d 121, 132, 293 P.2d 531, 539 (1956) ("The truth of the gist or sting of the defamation was not shown. Whether the article is true was for the jury. The evidence fully supports the implied finding that it is false").

Moreover, the record contradicts Plaintiffs' assertion that Glass admitted fabricating two of the statements purported to be substantially true. [Pls.' Opp'n at 33; *see* McNamara Decl., Ex. X (Glass Declaration).]

■■■ Finally, as set forth below, the record contains sufficient evidence to corroborate the substantial truth of Glass's statements regarding D.A.R.E.'s attempts to "silence" or "play hardball" with its critics, to "suppress scientific research" and "scare out science."

### The Research Triangle Institute

Susan Ennett of the Research Triangle Institute stated in her deposition that she and her fellow researchers at RTI received a cease and desist letter from D.A.R.E.'s attorney, and were worried that they would be sued if they presented their research at an upcoming conference. She recalls that their study was "on track," but then "things did start to break apart." She also stated that RTI researchers promised to suspend public comment regarding D.A.R.E. "in the spirit of trying to cooperate with the D.A.R.E. people and to defuse some of the anger over this study," which was an unprecedented concession to objections voiced by the subject of a study conducted by RTI. [McNamara Decl., Ex. NN (Ennett Deposition) at 63, 71, 76–77, 139.]

### The American Journal Of Public Health

Glass's article accused D.A.R.E. of endeavoring to prevent the publication of the RTI study in the American Journal of Public Health ("AJPH"). [Defs.' Mot. Summ.J. at 32.]

Roberta Silverman, a public relations consultant retained by D.A.R.E., admitted that D.A.R.E. asked the AJPH to suspend publication of the RTI study pending further research, and informed the journal that D.A.R.E. was prepared to seek "legal redress" if incorrect information was published. She further testified that the NIJ refused to become involved in any discussions between D.A.R.E. and AJPH "to discourage publication" of the results of the RTI study because, as a government agency, it was especially sensitive to possible First Amendment issues. Ms. Silverman recommended in her own written report to D.A.R.E. that "we concentrate our efforts on preempting the Journal rather than attempting to suppress its Meta-analysis." [McNamara Declaration, Ex. II (Silverman Deposition) at 274–75, 280–81, 282.]

AJPH editor Sabine Beisler testified that she received a telephone call from a D.A.R.E. representative who spoke "in an angry voice," and implied that the AJPH "would be doing something wrong by publishing the study, there might be consequences, but nothing was spelled out." She received another telephone call which "just reinforced the first." Beisler understood the tenor of the calls to be "intimidation with the purpose of making the journal pull the article until the very last minute," pressure she had never experienced in her publishing career. [McNa-

mara Decl., Exs. KK (Beisler Deposition) at 37, 38, 40, LL (Beisler Declaration) at 1–2.]

**"Dateline: NBC"**

Defendants assert the substantial truth of the statement that Plaintiffs applied pressure to the producers of "Dateline: NBC" regarding a broadcast critical of the D.A.R.E. program. They point out that Levant wrote a letter to Jack Welch, the Chief Executive Officer of NBC's parent company, General Electric, regarding alleged bias in "Dateline NBC's" report on D.A.R.E. attempting to pressure General Electric or NBC to suspend the broadcast. [McNamara Decl., Ex. EE (Levant Letter to Jack Welch) at 4.]

The letter characterizes the "actions and tactics" of the show's producers as bordering on "serious ethical violations, if not journalistic fraud." Levant accuses "Dateline: NBC" producers of deliberately scheduling an interview with him to coincide with the date of his wife's bone marrow transplant operation, and accuses the reporter's failure to appear for the meeting as an "arrogant and manipulative power play." Levant refers to a "staged" parents' meeting "set up" for the benefit of "Dateline: NBC." He accuses NBC of editing an interview with a D.A.R.E. official so that statements reflecting D.A.R.E.'s views would not provide information about the program, but rather serve as soundbites to fit into predetermined slots in a news story that had "already ... been put together." Levant also takes issue with the planned broadcast date of the "Dateline: NBC" show in question, one day before President Clinton was to proclaim National D.A.R.E. Day. Levant accuses NBC of "making a mockery of what is a very important event for America's children," and states that this should be "off limits, even for the sake of ratings. It is crossing the line." [McNamara Decl., Ex. EE (Levant Letter to Jack Welch) at 1–4.] In short, the letter is aptly characterized as an attempt to pressure NBC to suppress the broadcast of material critical of D.A.R.E.

Thus, Defendants have met their burden of demonstrating the substantial truth of Glass's allegations that D.A.R.E. tried to "silence" or "play hardball" with its critics, to "suppress scientific research" and "scare out science." Defendants have verified the "substance, the gist, the sting," of statements they purport to be substantially true. *Masson*, 501 U.S. at 517, 111 S.Ct. at 2433 (quoting *Heuer*, 15 Cal. App.2d at 714, 59 P.2d at 1064); *see also Ferlauto*, 74 Cal.App.4th at 1404, 88 Cal. Rptr.2d at 851.

## VIII. STATEMENTS "OF AND CONCERNING" PLAINTIFFS

██ Contrary to Defendants' contention, those statements in "Truth and D.A.R.E." referring to unlawful activity by D.A.R.E. supporters are "of and concerning" the D.A.R.E. program and Levant for defamation purposes. The First Amendment requires a plaintiff to establish that the statement on which the defamation claim is based is "of and concerning" the plaintiff. *Isuzu Motors, Ltd. v. Consumers Union of United States, Inc.*, 12 F.Supp.2d 1035, 1044 (C.D.Cal.1998) (quoting and citing *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1042, 232 Cal.Rptr. 542, 547, 728 P.2d 1177 (1986)); *New York Times*, 376 U.S. at 288–89, 84 S.Ct. at 730–31; *Ferlauto*, 74 Cal.App.4th at 1404, 88 Cal.Rptr.2d at 851 (quoting *Blatty* 42 Cal.3d at 1042–1044, 232 Cal.Rptr. at 547–49, 728 P.2d 1177). "The 'of and concerning' or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt." *Blatty* 42 Cal.3d at 1044, 232 Cal.Rptr. at 548, 728 P.2d 1177.

██ To satisfy this requirement, "the plaintiff must effectively plead that the statement at issue either expressly mentions him or refers to him by reasonable implication." *Blatty*, 42 Cal.3d at 1046,

232 Cal.Rptr. at 550, 728 P.2d 1177. Under California law, "[t]here is no requirement that the person defamed be mentioned by name.... It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff ... [or] if the publication points to the plaintiff by description or circumstance tending to identify him." *Church of Scientology of California v. Flynn*, 744 F.2d 694, 697 (9th Cir.1984) (quoting *Di Giorgio Fruit Corp. v. AFL–CIO*, 215 Cal.App.2d 560, 569, 30 Cal.Rptr. 350, 355 (1963)). The statements at issue are to be examined in context, and considering the totality of the circumstances. *Isuzu Motors, Ltd.*, 12 F.Supp.2d at 1044.

 Defendants argue that Glass's statements alleging unlawful activity are not actionable because they do not meet the "of and concerning" requirement. The accusations, [see Pls.' Opp'n at 9 (statements b, f, g, and h) ], Defendants contend, concern not D.A.R.E. or Levant, but unnamed D.A.R.E. *supporters*. [Defs.' Mot. Summ.J. at 34.] Plaintiffs retort that the defamed person need not be mentioned by name, and the "of and concerning" requirement is satisfied here because the jury can infer that the defamatory statement applies to the plaintiff; the "undisputed evidence demonstrates that [Defendants] D.A.R.E. and Levant and D.A.R.E. supporters are interchangeable throughout the article". [Pls.' Opp'n at 28, 30.]

The statements linking "D.A.R.E. supporters" to unlawful activity are "of and concerning" D.A.R.E. The program is referred to by reasonable implication. *Blatty*, 42 Cal.3d at 1046, 232 Cal.Rptr. at 550, 728 P.2d 1177. The language of the statements at issue impliedly refer to D.A.R.E. and Levant. Without some countervailing explanation, references to actions taken by an organization's supporters imply that such actions were undertaken at the behest, or certainly with the approval, of the organization itself.

 Similarly, the statements concerning unlawful conduct by D.A.R.E. supporters are also "of and concerning" Levant.

Although his name does not appear in the statements themselves, taken in the context of the article as a whole, *Isuzu Motors, Ltd.*, 12 F.Supp.2d at 1044, Levant is identified as personally synonymous with D.A.R.E. and its anti-drug efforts. The article calls him the "crusading ex-cop who leads [D.A.R.E.]," and uses terms such as "Levant's D.A.R.E.," which create a close association between Levant and the organization itself. This leads readers to believe that actions taken on behalf of D.A.R.E., including unlawful behavior, were probably directed, encouraged, or approved by Levant himself. [Guttman Decl., Ex. J ("Truth and D.A.R.E." article).]

Although Plaintiffs can show that these statements satisfy the "of and concerning" element of defamation, this showing is not dispositive because Plaintiffs have not demonstrated that Defendants published "Truth and D.A.R.E." with actual malice, as set forth above.

## IX. CONCLUSION

Defendants did not exercise control over the means of Glass completing his work for *Rolling Stone*, and neither they nor Glass perceived their business relationship to be one of employer-employee. Thus, Glass was an independent contractor, and his knowledge of his own falsehoods cannot be imputed to Defendants.

Plaintiffs have not shown a reasonable jury could find that clear and convincing evidence demonstrates Defendants acted with knowledge or reckless disregard of the truth; therefore, they cannot establish that Defendants acted with actual malice in publishing "Truth and D.A.R.E."

The two Editor's Notes appearing in the July 9–23 and August 9, 1998 issues of *Rolling Stone* were not republications of the alleged defamatory remarks from "Truth and D.A.R.E.," and in any event, Defendants' liability is foreclosed by California Civil Code section 45a, because Plaintiffs stipulated not to seek special damages.

The four allegedly defamatory statements in "Truth and D.A.R.E." concerning "strong-arm tactics" and attempts to suppress scientific research are substantially true, and hence not defamatory.

The four allegedly defamatory statements in "Truth and D.A.R.E." describing unlawful conduct by "D.A.R.E." supporters and operatives are "of and concerning" Plaintiffs, but are not actionable because Plaintiffs have failed to prove actual malice.

For these reasons, and as expressed fully herein, no genuine issue of material fact remains for resolution at trial, and Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.